UNITED STATES of America for the Use of the B's COMPANY, Appellee,

v.

CLEVELAND ELECTRIC COMPANY OF SOUTH CAROLINA, Appellant.

No. 10763.

United States Court of Appeals Fourth Circuit.

Argued Jan. 10, 1967.

Decided Feb. 6, 1967.

W. Ray Berry, Columbia, S. C. (Michael H. Quinn and Fulmer, Barnes, Berry & Austin, Columbia, S. C., on brief), for appellant.

D. A. Brockinton, Jr., Charleston, S. C. (Brockinton & Brockinton, Charleston, S. C., on brief), for appellee.

Before SOBELOFF, J. SPENCER BELL and WINTER, Circuit Judges.

J. SPENCER BELL, Circuit Judge:

This is an appeal from a judgment by the court without a jury. The B's Company, a use plaintiff, brought suit under the provisions of the Miller Act (40 U.S.C. §§ 270a–270b (1964)) against the Cleveland Electric Company of South Carolina, a prime contractor, and its

bondsman for monies due it as a subcontractor for labor and materials furnished on a contract with the Navy's Polaris Missile Assembly Base at Charleston, South Carolina. The trial court denied a setoff claimed by the prime contractor, and from that portion of the decision it appeals.

Among other things, the contract required that a building be erected and that after its completion it be covered with earth. The subcontractor's contract required it to furnish the labor, material, and equipment necessary to perform the earth work including the obligation to place earth fill over the building. During the performance of the contract earth was removed and stored at the site to be used for covering the building. This material was inspected and accepted by the Navy's resident officer in charge of construction. The building was completed and covered by the inspected material under Government surveillance. Performance of that portion of the contract involved in the use plaintiff's subcontract was completed, inspected, and accepted by the Navy on November 22, 1963, and in the following January the subcontractor left the job site.

On March 5, 1964, the Navy's resident officer in charge of construction notified the prime contractor that the roof of the building leaked and ordered it to remove a part of the earth from the building, and cure the defect in the roof. All parties agreed that the defect existed, that it was a latent defect, and that it was the duty of the contractors to repair the defect promptly. This plaintiff did not have the roofing contract and was not involved in any way in that order. While the earth was removed to repair the leak, a new resident officer in charge

of construction for the Navy decided that the earthen cover which this plaintiff had placed on the building did not meet contract specifications because it contained too high a percentage of organic materials, and on March 23, 1964, he ordered the prime contractor to remove all of the earth cover and replace it with other material. The prime contractor demanded of the subcontractor that it perform. The subcontractor refused on the ground that the material used to cover the building had been inspected and approved by the then officer in charge for the Navy and informed the prime contractor that neither contractor was obligated to perform since the job had been completed and accepted and this particular material had been inspected and passed by the then officer in charge, thus negativing any contention by the Navy that the alleged organic content of the material constituted a latent defect.[1] The prime contractor notified the subcontractor that it would perform and would back charge it with all costs. After protesting the order of the resident officer in charge of construction on the ground suggested by the subcontractor, the prime contractor performed without undertaking to exhaust his administrative remedies under the disputes clause of his contract and then filed a claim for an equitable adjustment under the changes article of the contract on the theory that the Navy had changed the specifications for the cover material. The claim was disallowed by the resident officer in charge of construction but upon appeal to the Chief of the Bureau of Yards and Docks, who is known as the contracting officer under the general provisions of the contract, the claim was allowed in the amount of $63,214.00.

[1] Only the existence of a latent defect would have justified the Navy's order after completion, inspection and acceptance of the job. Paragraph 10 of the general provisions of the contract read:

"10. INSPECTION AND ACCEPTANCE

\* \* \* \* \* \* \*

"(f) Unless otherwise provided in this contract, acceptance by the Government shall be made as promptly as practicable after completion and inspection of all work required by this contract. Acceptance shall be *final and conclusive* except as regards *latent defects*, fraud, or such gross mistakes as may amount to fraud, or as regards the Government's rights under any warranty or guarantee." (Emphasis added)

The prime contractor back charged the subcontractor with the expense, including an attorney fee for prosecuting the claim, plus a sum equal to interest on the amount allowed for the period during which the money was withheld while the claim was being prosecuted. The district court found that the subcontractor was justified in refusing to return to the site and comply with the Navy's order and it, therefore, denied the setoff. We conclude that the trial court's findings of fact are not clearly in error and that its legal conclusions are correct.

 The basic error of the prime contractor in this appeal is his contention that the subcontractor is bound in every way and exactly as the prime contractor is bound by the terms of the prime contract. It is true that the terms of the subcontract stated that the subcontractor was bound by the terms of the prime contract and that it assumed the prime contractor's obligations to the Government insofar as applicable to the work performed by the subcontractor, but this identical language has been held, and we think properly, not to require the subcontractor to pursue the administrative remedies given the prime contractor in the disputes article. Central Steel Erection Co. v. Will, 304 F.2d 548 (9 Cir. 1962); Fanderlik-Locke Co. v. United States ex rel. Morgan, 285 F.2d 939 (10 Cir. 1960), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961). The Government does not recognize or deal with the subcontractor and owes no obligation to him for the work he performs. United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L. Ed. 1039 (1944); United States v. Driscoll, 96 U.S. 421, 24 L.Ed. 847 (1877). The subcontractor is not a party to the government contract and is obligated only to perform its contract with the prime contractor without fault. Cf. John A. Johnson & Sons Inc. v. United States ex rel. Baltimore Brick Co., 153 F.2d 534 (4 Cir.), cert. denied, 328 U.S. 865, 66 S.Ct. 1372, 90 L.Ed. 1636 (1946). Having properly performed and having had its work inspected and approved by both the prime contractor and the Government, the subcontractor was entitled to collect his money and go about his business. By the terms of the contract he was entitled to his pay "on demand for his work or materials as far as executed and fixed in place, less the retained percentage, at the time the certificate should issue, even though the Architect fails to issue it for any cause not the fault of the Subcontractor." Here the certificate had issued. If the subcontractor is not paid, his only remedy is a suit under the Miller Act. He has no lien and no claim against the Government. This is the reason for the Act and, while this right to sue may be waived by clear and express provisions in the contract between the prime contractor and the subcontractor, no such provisions are contained in the contract at issue here and no such drastic curtailment of the subcontractor's rights will be read into a general agreement to be bound by the terms of the prime contract in so far as they affect the work of the subcontractor. See Central Steel Erection Co. v. Wills, supra; Fanderlik-Locke Co. v. United States ex rel. Morgan, supra. We think that that agreement was intended to cover the quality and manner of performance of the subcontractor, not the rights and remedies between the prime contractor and the subcontractor. Thus the obligation to pursue and to exhaust the administrative remedies provided in the disputes article of the prime contract is the prime contractor's obligation alone, and any conflict between these divergent remedies constitutes a business risk which the parties incur by virtue of their different contracts. Cf. John A. Johnson & Sons v. United States ex rel. Baltimore Brick Co., supra. Since the subcontractor was under no obligation to perform the extra work under his contract with the prime contractor, we agree with the district court that he could not be back charged with the expenses of the prime contractor in pursuing its administrative remedies under its contract, nor for a sum equivalent to the interest on the money which the

prime contractor was ultimately allowed for performing.

█ This disposes of the appeal; however, in deference to arguments of appellant's counsel we would add that we do not think the subcontractor would be liable for the prime contractor's cost of pursuing his administrative remedies in this case even if it had been bound to pursue the administrative remedies set out in the prime contract. The contract plainly provides that final inspection shall relieve the parties of any further obligation except for fraud or latent defects. The Navy's order of March 23, 1964, did not charge fraud or claim a latent defect, and indeed it could not have done so because the earth which was used had been inspected and approved by the Government and was placed under its supervision. But more important, the order of March 23, 1964, which raised a factual question, was issued by the resident officer in charge of construction and the contract specifically provides that the prime contractor does not have to act on an order involving a dispute of fact until he is commanded to do so by the contracting officer who is superior in command to the resident officer in charge of construction. The failure of the prime contractor to avail himself of this simple one-step procedural appeal—as urged by the subcontractor—before performing may very well have caused the expense involved in the appeal which was taken after the performance. Certainly at the exact time when the prime contractor ordered the subcontractor to proceed, there was no obligation on either contractor to do so before an appeal was taken to the contracting officer, who was readily available. The real cause of the prime contractor's extra expense was the Navy's improper order, not the subcontractor's insistence upon his rights under both the contract and the general law.

The order of March 23, 1964, did not purport to involve the changes article of the contract, which was the article under which the prime contractor mistakenly undertook to do the work. The order clearly purported to require the work to be done in order to "meet[ing] the compaction requirements for fill of 90%, all in accordance with the contract specifications." After acceptance and certification, the Government could not compel the contractor to redo the work or do extra work, even had the order been issued by the proper authority. The Armed Services Board of Contract Appeals has so ruled in a number of instances. In Octagon Process, Inc., ASBCA No. 2667, 59–1 BCA § 2270, where the Government had required replacement of an earthen cover, the Board said:

> "Nor do we consider that there is any evidence of a latent defect. The backbilling and compaction were done pursuant to standards established by the Government, under the constant surveillance of Government inspectors, and all apparently to the satisfaction of the Government. Under the circumstances we cannot classify the defects as hidden.

> "We conclude that there is no contractual requirement for appellant to return after acceptance and correct the work. T. F. Scholes [ASBCA No. 5270, 59–1 BCA § 2244, at pp. 9915–16]."

The judgment of the court is

Affirmed.