429 F.2d 764
 JOHN W. JOHNSON, INC., a Corporation
v.
BASIC CONSTRUCTION CO., Inc., Appellant, Defendant and Third Party Plaintiff, Edward Durell Stone,
JOHN W. JOHNSON, INC., a Corporation
v.
BASIC CONSTRUCTION CO., Inc., Appellant, Defendant and Third Party Plaintiff, Edward Durell Stone,
The Travelers Indemnity Co., Third Party Defendant.
JOHN W. JOHNSON, INC., a Corporation, Appellant,
v.
BASIC CONSTRUCTION CO., Inc., Defendant and Third Party Plaintiff, Edward Durell Stone.
JOHN W. JOHNSON, INC., a Corporation, Appellant,
v.
BASIC CONSTRUCTION CO., Inc., Defendant and Third Party Plaintiff, Edward Durell Stone,
The Travelers Indemnity Co., Third Party Defendant.
 No. 22813.
 No. 22814.
 No. 22836.
 No. 22837.
 United States Court of Appeals, District of Columbia Circuit.
 Argued March 2, 1970.
 Decided June 22, 1970.
 COPYRIGHT MATERIAL OMITTED Mr. Alexander M. Heron, Washington, D. C., with whom Mr. John A. Whitney, Washington, D. C., was on the brief, for appellant in Nos. 22813 and 22814 and appellee Basic Construction Co., Inc. in Nos. 22836 and 22837.
 
 Mr. John P. Arness, Washington, D. C., with whom Messrs. James E. Murray and David J. Hensler, Washington, D. C., were on the brief, for appellant in Nos. 22836 and 22837 and appellee John W. Johnson, Inc. in Nos. 22813 and 22814.
 Mr. John F. Myers, Washington, D. C., with whom Mr. Kahl K. Spriggs, Washington, D. C., was on the brief, for appellee Stone in Nos. 22836 and 22837.
 Before WRIGHT, McGOWAN and MacKINNON, Circuit Judges.
 MacKINNON, Circuit Judge:
 
 
 1
 This is an appeal in a breach of contract case brought by John W. Johnson, Inc., a painting subcontractor, against Basic Construction Co., the prime contractor, and Edward Durell Stone, the architect. The project involved the construction of several buildings for the State University of New York at Albany. Basic Construction Company (hereinafter Basic) contracted to construct these buildings for a compensation of approximately $25 million, and subcontracted out the painting and wallcovering work to John W. Johnson, Inc. (hereinafter Johnson), a Washington, D.C. corporation, for $375,000. The architect, Edward Durell Stone (Stone) was the agent of the owner, the State University Construction Fund (hereinafter the Fund), and was in charge of supervising the construction. Jurisdiction is vested in this court by D.C.Code §§ 11-101 and 11-521. The amount in controversy exceeds $10,000 exclusive of interest and costs.
 
 
 2
 Johnson commenced work under its subcontract in April of 1965. By September, some peeling of the paint on the ceilings in the Biology Building had been observed, and by October the condition had worsened to the point where Johnson was directed to stop painting all the ceilings.[1] At this time no one knew the cause of the peeling. The architect called in a research firm which eventually determined that the peeling was caused by the presence of stearic acid on the ceiling. Stearic acid had been employed by Basic as a release agent in removing the temporary molds used in forming the concrete arches which constituted the ceilings. The research firm recommenced that either the stearic acid be removed or that a primer coat of paint be applied which would permit a secure bond for the two final coats. Because the stearic acid was difficult to remove, the architect after some time spent in experimenting adopted the solution of removing the peeling paint and then applying the additional coat of primer paint. However, on December 20, 1965 he ordered that Basic bear this cost on the ground that it was its responsibility under its contract to remove foreign substances from the ceilings before painting. Basic disputed this liability and appealed to the Fund under a Disputes Clause in the prime contract; meanwhile on December 22nd it ordered Johnson to proceed with the application of the additional paint in accordance with the architect's directive.[2] The architect's directive stated the work was "in lieu of, not in addition to, original contract requirements" and that "No extra to contract will be approved by this office, for this work." Johnson denied any responsibility for the failure, on request submitted an estimate as to the cost of the extra painting, requested a change order or other definite assurance of payment it claimed it was entitled to under its contract, and started the painting under protest without relinquishing its right to compensation. Basic did agree to advance Johnson $1,500 a month to assist the latter to meet some of the cost of the additional painting. However, Basic expressly conditioned its advances with the reservation that same did not constitute an acknowledgment of liability to Johnson for the disputed painting work.
 
 
 3
 The Fund then on January 10, 1966 rendered its decision upon the appeal by Basic. It determined that the stearic acid had been used with the architect's knowledge and approval, that the removal of the stearic acid by means of "exotic" cleaning compounds was not anticipated under its contract with Basic,[3] and that the Fund would therefore bear the cost of the additional coat of primer. However, apparently as a compromise with Basic, the Fund held that Basic was responsible for removing the defective coat of paint on the ground that it should have tested the adhesiveness of the paint before commencing the painting operations. Although Basic denied this liability, it nevertheless agreed to continue work and to resolve the matter at a later date.[4]
 
 
 4
 In summary, there was at this point an unresolved three-way dispute as to who should bear the cost of removing the original coat of paint. The Fund had ruled that Basic should bear the cost; this was disputed by Basic who contended the responsibility should lie on the Fund. Johnson was caught in this cross fire — it had denied liability entirely and was interested primarily in receiving some assurance of payment for the extra work it was being directed to perform and of being absolved from liability for the expense of removing the paint in the peeling areas.
 
 
 5
 Another element was then injected into this unstable situation. Painting had been stopped, first for strikes in July and August, and secondly since early October while the cause of the peeling was being determined, and the Fund thereafter became increasingly upset over the slow progress being made in the painting due to the fact that Johnson was not employing what the Fund considered to be an adequate number of painters to meet completion deadlines. The Fund put pressure on Basic to speed up the work and Basic in turn warned Johnson that more painters would be needed to meet the approaching completion deadlines. During this time Johnson was complaining that he had not received the change orders required by his subcontract before he could be assured of payment for the extra work, that he had not been absolved of responsibility for the cost of removing the ceiling paint in the Biology Building and that to accelerate the work by adding the additional workmen being required by the Fund would decrease their efficiency and substantially increase his cost, for which he should also receive some assurance that he would be compensated. A temporary working arrangement was reached between Johnson and Basic to gradually build up the painting crews, but apparently this was not enough to satisfy the architect, Edward Stone, who recommended to the Fund that Johnson's contract be cancelled. The Fund agreed, and on February 9, 1966, the architect Stone wrote Basic directing it to cancel its subcontract with Johnson and advising that no extension of time would be granted for this cancellation.[5]
 
 
 6
 Basic, however, was reluctant to discharge Johnson. Basic did notify Johnson by telephone of the February 9th directive it had received to cancel his contract but recommended that Johnson come in to discuss the matter. This Johnson refused to do, and the next day informed Basic that unless it received an assurance of payment for the extra work, it would quit the job.
 
 
 7
 Again on February 12th, Johnson, according to Basic's memorandum of a telephone conversation, demanded that Basic send him a telegram or letter "cancelling his contract if that was what he intended to do." Later in the day, Johnson's attorney orally informed Basic that Johnson was not financially able, even if he so desired, to carry the burden of increasing the number of painters to 60 or 80 without some help and agreed that Johnson would submit information as to the extra cost for the third coat of paint and for escalating of the work. On February 14th Basic wrote the Fund and requested them to conform to the contract and to state they had determined that Johnson was "incompetent, careless or uncooperate [uncooperative]", if they had so determined. Basic also stated that Johnson had 35-38 painters working and informed the Fund that Johnson was claiming the extra work which was being directed was not caused by any fault of Basic or Johnson and that it entailed an acceleration of work not contemplated by the original contract and for which additional compensation should be paid. Johnson also submitted the requested additional information to Basic in detailed form on February 14th[6] which estimated (without prejudice) the cost for the extra work at $98,000 and $42,000 additional for the escalation.[7] On February 16th Basic informed Johnson by telephone that such demands "were completely unacceptable to us and that we could not go along with them." Basic also at that time refused to state its position to Johnson as to whether they were going to wire him cancelling his contract and Johnson then hung up. The architect's direction to Basic to cancel the contract had been dated February 9th and under the contract the architect's decision was "final, binding and conclusive" unless the contractor appealed within five days. Basic did not within such period appeal the decision.
 
 
 8
 Johnson's problem was largely one of financing the additional work that was being demanded of him on an accelerated basis. This was aggravated by the fact that he had not been paid for some past expenditures he claimed were due him. The assurances Johnson demanded were not forthcoming, and Johnson on February 17, 1966 pulled his men off the job.
 
 
 9
 Upon the above facts Johnson brought suit against Basic and Stone for damages resulting from breach of contract alleging that Basic refused to issue change orders and make payments in accordance with the contract and wrongfully terminated Johnson's subcontract in order to conform to Stone's wrongful direction and thereby made it impossible for Johnson to perform his subcontract. The court below held for Johnson against Basic and entered damages in the amount of $66,399.68 in payment for work done by Johnson before it abandoned the job, and for $5,367.57 in payment for certain material left at the job site by Johnson which was seized by Basic after Johnson abandoned work and Basic's counterclaim for damages for breach was also denied. John W. Johnson, Inc. v. Basic Construction Co., 292 F.Supp. 300 (D.D.C.1968). Basic is here appealing this decision. On Johnson's suit against the architect, Stone, for cancelling its subcontract, the trial court held for the architect on the ground that Johnson had abandoned the work because it had not received assurance of payment rather than because of the architect's cancellation of its subcontract. Johnson is here appealing this decision. We affirm both decisions below, and turn first to Johnson's suit against Basic.
 
 
 10
 * Appellant's brief asserts that the first issue is:
 
 
 11
 Whether Basic was required to give Johnson a commitment for payment for the extra painting when it had received none from the Fund and when it had received no definite statement from Johnson of the amount claimed?
 
 
 12
 The subcontract contained two references to Extra Work. The first was a sentence at the bottom of Exhibit "A" to the subcontract stating:
 
 
 13
 Subcontractor's particular attention is called to Article X of the Specifications relative to Extra Work.
 
 
 14
 This article of the Specifications reserved in the Fund the right to modify or change the contract between the Fund and Basic "by supplement thereto providing for extra work in order to carry out and complete more fully and accurately the work called for herein." The Article further provided that if the changes "increased the work * * * the contract consideration shall be increased * * * *" and the completion date extended as the Fund may determine; that unless the parties agreed on the amount of the increase or a unit price was contained in the contractor's proposal, the amount of the increase shall be calculated and determined by the Fund according to (1) the fair and reasonable cost generally plus profit, or (2) the actual cost, provided the Fund gives the contractor notice that it intends to exercise this option before the extra work commences. Basic gave no such notice. The last sentence in the Article provided, "Nothing in this article shall excuse the contractor from proceeding with the extra work as directed."[8]
 
 
 15
 The second reference in the subcontract to extra work is contained in a printed paragraph at the bottom of the contract just ahead of the signatures. It provides:
 
 
 16
 The Contractor may at any time during the progress of the work and without notice to any surety require any alteration, deviation, addition or omission from the work contemplated by this contract; in the event of either case the increase or decrease of cost occasioned thereby shall be estimated according to the price fixed by this contract for the whole work, and allowance shall be made on the one side or the other as the case may be; where Owner is the Government,[9] adjustments and allowances for changes in the work provided herein shall be made in confirmity with the method established by the Government; but no such change shall be made, nor shall demand be made on the Contractor on account of any such change, unless the same be ordered in writing signed by the Contractor.
 
 
 17
 Regardless of which extra work provision is deemed controlling, Article X or the "Changes" provision of the subcontract, they both required something more than was given here to Johnson. Under Article X a "supplement" to the contract was required and the subcontract required an order in writing signed by the contractor.
 
 
 18
 We consider the interpretation Basic gave to its own contract with the Fund in a letter it wrote the Architect.[10] with respect to an order to perform the extra work is equally applicable to the relationship between Johnson and Basic whether Article X or the subcontract provision controls. On December 15, 1965, in reply to a letter from the Architect calling for an extra third coat system without more elaboration, Basic wrote to Stone (the Architect) stating:
 
 
 19
 We do not consider that your letter constitutes a specific directive to us to proceed with the work in accordance with the recommendations in Moore Laboratory's Report dated December 13, 1965. We will not proceed without such specific instructions, as it is the responsibility of the Architect to specify and direct the work, and ours only to execute the work.
 
 
 20
 Further, we cannot proceed with the work without a commitment from you that we will be reimbursed for additional costs due to application of the special primer sealer, application of the additional coat of paint, and removal of the peeling paint. (Emphasis added.)
 
 
 21
 Whether we consider the extra work controlled by the terms of Article X or by the last paragraph of the subcontract makes no substantial difference because Basic did not comply with either requirement and because the requirement of the subcontract for a written change order is applicable in both instances, since it is not in conflict with Article X.[11] We construe that provision of the subcontract to require substantially the same type of financial commitment as Basic outlined in its December 15th letter to the architect. In the phraseology of the subcontract the situation required an "order" (1) for the "addition" to the "work contemplated by this contract"; (2) that "allowance shall be made" for the "increase" in the cost (this requires the commitment to pay)[12]; and (3) that same be "in writing signed by the contractor." Johnson thus had at least equal rights under its contract arrangement with Basic as Basic had under its prime contract with the Fund and possibly more because the closing provision of the subcontract was stronger than the prime contract provision.
 
 
 22
 Johnson was accordingly fully within its rights when it wrote Basic on January 3, 1966 with respect to its own extra work situation stating:
 
 
 23
 You have been unwilling in accordance with the paragraph referring to changes on the bottom of page 2 of our subcontract[13] and you apparently expect us to do the work which is required to resolve your dispute with the owner, or architect without being compensated therefore [sic].
 
 
 24
 We are not finiancially [sic] able to bear that burden even if we were inclined to do so and insistence on your part, if complied with, would put us out of business. (Emphasis added).
 
 
 25
 The provisions of the subcontract referred to in the letter justified Johnson's action in making this request.[14] It was never honored by Basic.[15] Instead, they contended then, and they contend now, that they were not required to give Johnson a commitment for payment for the extra painting since it had received none from the Fund. But the subcontract clearly required a specific direction in writing to do any work that was in addition to the original contract and that allowance be made for the increase in cost. It was not a sufficient compliance with Article X or the "Changes" provision of the subcontract for Basic to order the extra work and at the same time to refuse to admit or recognize that it was extra work that was being ordered. Nevertheless, such was the effect of Basic's actions when they refused Johnson's demands for a commitment to pay the cost of the extra painting and the costs incurred by accelerating the contract.
 
 
 26
 This brings us to consider whether the fact that Basic had not received a commitment from the Fund operated in any way to relieve Basic of its obligation to furnish Johnson with a "supplement" to the contract or with a written order stating that the work being required was an "addition" from the work originally contemplated by the contract and making "allowance" for the increased cost or providing that the "contract consideration shall be increased." Basic contends that it was relieved of the obligation of furnishing such commitment under the circumstances because the subcontract fully integrated the terms and conditions of the prime contract and thus operated to bind Johnson to the same terms, including the Disputes Clause[16] of the prime contract. We do not so construe either the prime contract or the subcontract for two reasons.[17] First, because Basic never satisfied the requirement of Article X that there be a "supplement" to the contract providing that the contract consideration be increased. Second, because even if the prime contract were fully incorporated into the subcontract, its general provisions would not overcome the specific provision of the subcontract dealing with "Changes" which required Basic to give a written order for the work which made "allowance" for the increased cost.[18] Furthermore, the prime contract was only incorporated for the limited purpose of requiring compliance with the terms and provisions of the prime contract insofar as same were applicable to the work to be performed and did not extend to require adherence by the subcontractors to administrative remedies and decisions thereunder by the parties to the prime contract.[19]
 
 
 27
 The provision in the subcontract incorporating the prime contract by reference was required by the General Conditions of Basic's contract with the Fund which provided:
 
 
 28
 17. Subcontractors. * * * The Contractor shall execute with each of his subcontractors * * * a written agreement which shall bind the latter to the terms and provisions of this contract insofar as such terms and provisions are applicable to the work to be performed by such subcontractors. (Emphasis added).
 
 
 29
 This binds the subcontractor to the terms and provisions applicable "to the work," and we construe this to mean to the character and manner of the work to be done by the subcontractor. Guerini Stone Co. v. P. J. Carlin Construction Co., 240 U.S. 264, 277, 36 S.Ct. 300, 60 L.Ed. 636 (1916). Also, the subcontractor was not a party to the prime contract and he was not made privy to its provisions by having it incorporated by reference into its subcontract. In fact, the prime contract specifically provided that none of its provisions shall be construed as creating any contractual relation between the Fund and any subcontractor. (General Conditions, 17, Subcontractors.) Under such circumstances we have no difficulty in concluding that the fact that the prime contract was incorporated by reference into the subcontract did not justify an interpretation that would excuse Basic from the requirement of issuing a change order committing itself to pay for the extra work or require that Johnson be bound to Basic's position in any dispute vis-a-vis the Fund.
 
 
 30
 We will deal further with the interrelation of the two contracts in Part II wherein we discuss the Disputes Clause, but now we consider a subsidiary argument of appellant's first issue, i. e., the claim that somehow Basic had not received a definite statement from Johnson of the amount claimed for the extra work and that somehow this excused Basic's refusal to issue the commitment to pay for the extra work. In this respect we find that Johnson did comply with the requirements of the subcontract.
 
 
 31
 When Basic on December 15, 1965 first wrote Johnson enclosing a copy of the Architect's letter directing extra work it requested an estimate. Johnson replied the very next day and estimated a cost for ceilings only of $38,240 which he said would be increased in buildings where the painting followed trim and cabinets. On January 4, 1966, Johnson withdrew its estimate saying the actual cost was exceeding the estimate. All of this may have been premature because the final directions for the extra painting were not given to Johnson until January 14, 1966. If the Disputes Clause of the prime contract was applicable to Johnson (as Basic contends), it was required:
 
 
 32
 Within thirty (30) calendar days after such extra work was required to be performed * * * the contractor must submit to the Fund a verified detailed statement * * * of the items of extra work or of the details and amounts of any damage claimed by the contractor * * * *
 
 
 33
 Johnson complied with this requirement within the 30-day period by submitting the required information in a letter to Basic dated February 14, 1966.[20] So there is nothing to appellant's point in this respect.
 
 
 34
 These estimates were all that was required of Johnson and there was ample time after they were received by Basic for it to issue its change order, but instead it refused to act on the first estimate and rejected the second estimate out of hand and at all times refused to issue any commitment to Johnson to compensate for the "addition" of extra or increased work. Actually, it seems quite clear on this point that Basic is now trying to hide behind the claim that initially it needed a specific quotation from Johnson. This is not correct. Basic could have issued the change order for a fixed price or they could have directed the work and established or negotiated the method of computing the price. Had Basic really been withholding the change order because they were waiting for a specific figure from Johnson, they could have issued it immediately after they received Johnson's $38,240 estimate on December 16th, or if they did not consider that sufficiently definite, they could have negotiated further at that time. Or they could have directed the work on the January 14th estimates or in accordance with Article X could have given notice that they would pay the "cost" thereof or made definite counter offers on the price. That they followed none of these alternatives plainly indicates that they did not intend to issue any commitment, and they still contend they were not required to do so. We will discuss in Part II whether this position was justified by the Disputes Clause.
 
 
 35
 But before doing so we deal with Basic's contention that Johnson broke its contract when it abandoned the job eight weeks following the original breach by Basic after having accepted in the meantime certain advances and payments. We find that this point is not available to Basic as the parties had agreed at the time of the subsequent agreement that same would not constitute a waiver of their contract position or a relinquishment of any rights or claims against the other.
 
 II
 
 36
 The second issue framed by Basic's brief is:
 
 
 37
 Whether Johnson without following the Disputes Clause procedures, was entitled to abandon the job because of Basic's refusal to give a commitment for payment for the extra painting.
 
 
 38
 To a certain extent this involves many of the aspects of the issue discussed in Part I but is directed more specifically to the Disputes Clause which provides:
 
 Article XI. DISPUTES
 
 39
 A. If the Contractor claims * * * that any work he has been ordered to do shall be considered extra work * * * he must within five (5) calendar days after being ordered to perform the work claimed by him to be extra work and before proceeding to execute such work * * * file a written statement with the Fund of the basis of his claim and request a determination thereof.
 
 
 40
 B. Except as otherwise provided above with respect to work claimed by the Contractor to be extra work, the Contractor, pending and subsequent to the determination of the Fund with respect to any such disputed matter, shall proceed diligently with the performance of the Contract and in accordance with all instructions of the Fund and the architect.
 
 
 41
 C. The Fund shall notify the Contractor in writing of its determination of the validity of his claims. If the Contractor disagrees with such determination of the Fund he must, in order to reserve his rights based upon his said claims, within five (5) calendar days after receiving notice of the Fund's determination, file a written statement with the Fund that he reserves his rights in connection with such claims.
 
 
 42
 The critical question here is whether this clause was in any way applicable to Johnson.
 
 
 43
 In arguing for applicability, Basic relies on the following language in its subcontract with Johnson:
 
 
 44
 The subcontractor * * * agrees to * * * perform all work required by the above mentioned contract [the prime contract] * * * for furnishing and performing painting, finishing, vinyl wall covering work, etc., in accordance with the requirements of the prime contract documents, plans, specifications, general conditions, special conditions, addenda * * * and alternates * * * and as described more completely in Exhibit A * * * *
 
 
 45
 This incorporates the prime contract into the subcontract by reference, but we have previously noted in discussing the extra work provisions, that this was for the limited purpose of specifying "the work" to be performed. However, that holding did not control our decision with respect to the contract requirements for extra work because substantially the same result would have been reached under either extra work provision since both were subject to an additional written order or writing that was never furnished by Basic. So we consider the Disputes Clause in a slightly different context from the extra work provision, i. e., the Disputes Clause was not specifically incorporated by reference and it relates to a procedural matter which is farther removed from "the work" contemplated by the contracts.
 
 
 46
 The Disputes Clause basically provides the procedural means for the determination of liability between the owner and prime contractor in case a dispute arises. However, Johnson, as a subcontractor, is not a party to that contract, even though it is incorporated by reference into his subcontract, he had no rights thereunder, and there is no provision in the prime contract which would allow a subcontractor to appear or participate in any way before the Fund in a dispute which affected it. Indeed, the Fund,[21] as any other owner,[22] may not wish to deal with a subcontractor at all, and we do not criticize this mode of doing business. However, since there is no clear contractual language requiring Johnson to relinquish its right of abandonment in return for its questionable right to recover its extra cost through the hazards of litigation, and since the contract was drafted by Basic and ambiguities are to be construed most strongly against it, and since the Disputes Clause by its terms relates to administrative remedies between the owner and the prime contractor without any reference to the subcontractor, we conclude that the Disputes Clause is not applicable to disputes between Basic and Johnson.[23]
 
 
 47
 A similar result has been reached in other circuits. In United States for Use of B's Co. v. Cleveland Electric Co., 373 F.2d 585, 588 (4th Cir.1967), the court stated:
 
 
 48
 The basic error of the prime contractor in this appeal is his contention that the subcontractor is bound in every way and exactly as the prime contractor is bound by the terms of the prime contract. It is true that the terms of the subcontract stated that the subcontractor was bound by the terms of the prime contract and that it assumed the prime contractor's obligations to the Government insofar as applicable to the work performed by the subcontractor, but this identical language has been held, and we think properly, not to require the subcontractor to pursue the administrative remedies given the prime contractor in the disputes article. * * * We think that that agreement was intended to cover the quality and manner of performance of the subcontractor, not the rights and remedies between the prime contractor and the subcontractor. Thus the obligation to pursue and to exhaust the administrative remedies provided in the disputes article of the prime contract is the prime contractor's obligation alone * * * *
 
 
 49
 See also Central Steel Erection Co. v. Will, 304 F.2d 548, 551 (9th Cir.1962); Fanderlik-Locke Co. v. United States for Use of Morgan, 285 F.2d 939 (10th Cir.1960), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961). Special provisions of a subcontract prevail over provisions of a general contract incorporated by reference. Perry v. United States for Use of Newell, 146 F.2d 398, 400 (5th Cir.1945); Hill & Combs v. First Nat. Bank of San Angelo, 139 F.2d 740, 742 (5th Cir.1944).
 
 
 50
 The cases cited by Basic are not to the contrary. Several of these cases stand only for the proposition that a subcontractor is bound by the plans and specifications of the prime contract. See, e. g., Ehret Magnesia Mfg. Co. v. Gothwaite, 80 U.S.App.D.C. 127, 149 F. 2d 829 (1945); Linde Dredging Co. v. Southwest L. E. Myers Co., 67 F.2d 969 (5th Cir.1933). Other cases cited by the appellee hold only that the architect's or engineer's decisions as to the quality or quantity of the work done under the specifications of a contract are binding on the subcontractor when there is a specific provision in the subcontract to such effect See Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp., 311 F. 2d 389, 395, 397 (4th Cir. 1962); Warner Construction Co. v. Louis Hanssen's Sons, 20 F.2d 483, 489-490 (8th Cir. 1927)[24]; Charles S. Wood & Co. v. Alvord & Smith, 258 N.Y. 611, 180 N.E. 354 (1932), aff'g 232 App.Div. 603, 251 N.Y.S. 35 (1931); Sweet v. Morrison, 116 N.Y. 19, 22 N.E. 276 (1889). There is no such provision here and the decision by the Fund went further and attempted to adjudicate legal rights and liabilities between itself and Basic. Johnson could have bound itself to the outcome of this determination, but our interpretation of the subcontract persuades us that it did not.[25]
 
 
 51
 We accordingly decide that Basic was required to give Johnson a commitment for payment for the extra painting even though it had received none from the Fund, that it breached the contract when it refused to do so, that Johnson's abandonment was fully justified and that it is entitled to be compensated for the work it performed.
 
 III
 
 52
 As for Johnson's suit against the architect Stone, the court below found on substantial evidence that Johnson did not abandon its contract because of the architect's directive to Basic to discharge him, but rather because it had not received assurance of payment from Basic. Thus the requisite legal clause between the architect's directive and Johnson's abandonment of its subcontract has not been proven.
 
 
 53
 The court's finding below is not clearly erroneous and we affirm.
 
 
 54
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Basic's field project manager directed Johnson to stop painting all the ceilings some time in October to find out the cause of the peeling. (App. 21-22.)
 
 
 [2]
 A letter was sent by Basic to Johnson directing work but all this fell short of being the commitment required by the Changes paragraph of the subcontractSee page 769 et seq., infra. This was admitted by Basic's Executive Vice President, H. P. Read, who testified Basic did issue an initial letter to Johnson but this contemplated a following document which was the change order and this final change order was never sent. (App. 69-70).
 
 
 [3]
 The contractual provisions onPreparation of Surfaces provided:
 "Properly prepare surfaces required to receive paint, finishes. * * * Thoroughly clean concrete, plaster surfaces, other surfaces to be painted or otherwise finished, of grit, efflorescence, grease, dirt, loose material, and the like." (Dfts. Ex. 6.)
 
 
 [4]
 This was the procedure envisioned by the Disputes Clause of the prime contract. See p. 774infra. The record does not show how the Fund finally ruled in this matter.
 
 
 [5]
 The architect, as the Fund's agent, could not deal directly with Johnson but rather had to deal with him through BasicSee note 21 infra.
 
 
 [6]
 The February 14, 1966 letter Johnson wrote Basic stated (1) that 23,853 man hours were necessary to complete the eight buildings, (2) that the change in painting specifications was not concluded until January 14, 1966, (3) that Johnson had expanded its crew to 35 men, (4) that if Basic desired further acceleration they would have to absolve Johnson from responsibility for the cost of removing ceiling paint in the Biology Building and accept certain invoices previously submitted totaling $12,513.73, (5) that Basic would have to agree to pay "around $70,000" (possibly more) due to change in ceiling painting specifications, and $14,438 (possibly more) for trim operation being advanced due to ceiling holdup, (6) that Basic should accept responsibility for painting and removing paint on metal partitions which should have come with factory finish, and (7) other miscellaneous items. Johnson estimated that these items would increase the sums due under the contract around $98,000 (possibly more) and if the painting crew were increased to 60 men the acceleration would reduce the efficiency by an additional $42,000. Johnson concluded by saying he was "not in a position to continue paying the men during these negotiations after February 15, 1966." Basic received this letter and on February 16, 1966 and at 9 A.M. told Johnson that his "demands * * * werecompletely unacceptable to [Basic] * * * and that [Basic] * * * could not go along with them." (Emphasis added.) Thereupon Johnson had his men pulled off the job.
 
 
 [7]
 This total of $140,000 for extra work is comparable to the $165,000 sought by the counterclaim of Basic against Johnson
 
 
 [8]
 This sentence must be read in conjunction with the provision of Article X providing for a "supplement" to the contract for extra work and if the subcontract provision on "Changes" is applicable it must be read in conjunction with the requirement therein for a written direction for any change involving an "addition" to the contract. So read, this sentence does not impose a requirement on the subcontractor that he perform the extra work under a direction which does not satisfy either requirement because it failed to increase the consideration or make allowance for the increased cost. Clearly, Basic could not just order extra work and refuse to recognize it was extra work by specifically failing to meet the contract requirements that it undertake in some manner a commitment to pay therefor
 
 
 [9]
 Government refers to the United States or to the State of New York as bodies exercising sovereignty and not to subordinate divisions thereof. In re Stillman's Estate, Sur., 53 N.Y.S.2d 718, 732 (1945). The State University Construction Fund is a corporate governmental agency constituting a public benefit corporation created within the University of New York. L.1962, c. 251 § 2et seq. effective April 1, 1962. McKinney's Consolidated Laws of New York Annotated Book 16, Education Law, § 370 et seq. The University is a continuation of a corporation created in 1784 under the name of The Regents of the University of the State of New York. Thus the Fund is not "Government."
 
 
 [10]
 The Architect was the agent of the Fund in many contract matters
 
 
 [11]
 A written "supplement" to the contract in accordance with Article X would have satisfied this requirement. Article X and the subcontract provided three alternative methods for fixing the price and all of these indicated that there would be some commitment by Basic to pay for extra work. If Basic were in doubt as to the amount they were always free to specify in accordance with Article X that the amount of the increase in the contract consideration would be the actual cost of the extra work. What Basic could not do was to order the extra work and contend that it had no obligation to pay therefor. To the extent that these methods were in conflict, all ambiguities were created by Basic and would be construed most strongly against it
 
 
 [12]
 Article X also required that the "contract consideration shall be increased."
 
 
 [13]
 This referred to the additional work provision of the "Changes" paragraph
 
 
 [14]
 Article X gave him an equivalent right to demand a "supplement" to the contract, if Article X is considered as controlling
 
 
 [15]
 Testimony of Basic's Vice President, Henry S. Read, proved that Basic never issued a change order:
 Q Now, did the Johnson Company make a demand upon Basic for a change order on account of the requests of Basic to have Johnson Company apply that third coat of paint?
 A Oh, yes, sir.
 Q Did Basic ever issue one?
 A No, sir.
 Read's testimony also was equivocal as to why Basic had not informed Johnson that the Fund had agreed to pay for the third coat of paint:
 Q Why did you not tell Mr. Johnson at the time that the Fund had agreed to pay for the third coat, and why did you not render him a change order for that cost?
 A Well, to answer that question in sequence, I think I did tell Mr. Johnson [the Fund] had agreed in principal to pay him for the third coat. I didn't issue a change order because we do not issue change orders to a sub-contractor on work assigned by the owner until we receive their official change order.
 THE COURT: Well, now, isn't there a provision in the contract that no payment shall be made for extras except pursuant to change orders?
 A Yes, sir.
 THE COURT: And yet you expect Johnson to do extra work without a change order? Is that so?
 THE WITNESS: Yes, Sir.
 * * * * *
 THE COURT: Well, you mean that the contractor and subcontractor should go ahead and do the extra work on the chance that the change order will be issued later?
 THE WITNESS: Yes, sir, that was the obligation we undertook.
 THE COURT: And if a change order was not issued later, what would happen?
 THE WITNESS: Then if they didn't our only recourse would be an appeal or inter-litigation against them.
 THE COURT: In other words, you wanted the sub-contractor to take the risk of the possibility of a change order not being issued? That is what this amounts to, does it not?
 THE WITNESS: Sir, we had some three-quarters of a million dollars of work that we had to do under this fashion under this contract.
 
 
 [16]
 See page 774 infra.
 
 
 [17]
 When the Fund held on January 10, 1966, that the contract did not require the removal of the stearic acid residue that decision necessarily determined without explicitly saying so, that "the fault lay in the requirement combining the use of stearic acid with the type of paint specified" in the contract specifications (Appellant's Reply Brief, p. 7). The fault was thus found to exist in the Specifications for which Johnson was in no way responsible. It is hard to see how, in view of such admissions, that Basic can contend there was any bona fide dispute between Basic and Johnson over Basic being obligated to furnish a supplement or change order agreeing to pay for the extra work
 
 
 [18]
 General language in a written document is limited by more particular words. Bock v. Perkins, 139 U.S. 628, 635-638, 11 S. Ct. 677, 35 L.Ed. 314 (1891); G. T. Schjeldahl Co., Packaging Mach. Div. v. Local Lodge 1680, etc., 393 F.2d 502, 504 (1st Cir. 1968); 4 S. Williston, Contracts § 619 n. 7 (1961); Restatement, Contracts § 236(c) (1932)
 
 
 [19]
 See p. 776infra.
 
 
 [20]
 This would be within 30 days of the date Johnson received the January 14, 1966 letter which was addressed to him at Washington, D.C. and would presumably have been actually received by him on January 17th, a Monday, and the first business day following the date of the letter
 
 
 [21]
 The Fund expressly avoided any contractual relationship with any subcontractor in the prime contract: "No provision of this Contract shall, however, be construed as creating any contractual relation between the Fund and any subcontractor * * * *"
 
 
 [22]
 For example, the United States may similarly avoid a contractual relationship with subcontractorsSee, e.g., United States v. Blair, 321 U.S. 730, 737. 64 S. Ct. 820, 88 L.Ed. 1039 (1944); United States for Use of B's Co. v. Cleveland Electric Co., 373 F.2d 585, 588 (4th Cir. 1967); Fanderlik-Locke Co. v. United States for Use of Morgan, 285 F.2d 939, 942 (10th Cir. 1960), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961).
 
 
 [23]
 An additional reason for deciding that the Disputes Clause in the prime contract was not applicable to the subcontractor may exist in that provision of the subcontract providing "All general language or requirements contained in thespecifications (including General Conditions or General Provisions) are superseded by this agreement * * * *" It is clear from a number of references in the testimony and documents that the Disputes Clause was one of the requirements that the parties considered to be "contained in the specifications." The reference in Exhibit A to the general contract calling attention to Article X (Extra Work) describes it as being part "of the specifications." The architect in his letter of February 9, 1966 to Basic directing cancellation of Johnson's contract indicated he considered Article 17 of the General Conditions entitled "Subcontractors" to be part of the Specifications (App. 182); Read, the Executive Vice President for Basic, in testimony referred to the Disputes Clause as being a requirement of the Specifications (App. 52); and Read also in testimony referred to Article 17 (Subcontractors) as being in the Specifications (App. 63). We note that the term "specification" is generally taken to be "the particulars or details of the plan * * * *" 13 Am.Jur.2d Building and Construction Contracts § 12 n. 12 (1964). The parties, of course, are free to define this term as they will, and we may not imply a different meaning in the face of a clear indication of the meaning of the term in the contract itself. Were there any doubts on this point, it would still be necessary to reach this result in accordance with the rule that contracts are to be most strictly construed against the drafter. See generally 17 Am.Jur.2d Contracts § 276 (1964).
 
 
 [24]
 The decision was binding only as to "matters of fact" but not as to "legal rights or liability."
 
 
 [25]
 Basic in its December 31, 1965 letter to Johnson admitted in effect that Johnson was not bound by the outcome of Basic's dispute with the Fund when it informed Johnson that it was appealing the architect's determination to the Fund and then said:
 [W]e further recognize and agree that whatever the result of this claim against the Owner may be, it will in no way prejudice any rights you may have against Basic under your subcontract agreement. (Emphasis added).