United States Court of Appeals
For the First Circuit

No. 92-1904

COMMERCIAL UNION INSURANCE COMPANY,

Plaintiff, Appellant,

v.

GILBANE BUILDING COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Judge Edward F. Harrington, U.S. District Judge]

Before

Torruella, Circuit Judge,

Bownes, Senior Circuit Judge,

and Stahl, Circuit Judge.

Michael P. Duffy, with whom Bert J. Capone, John J. O'Connor, and

Peabody & Arnold, were on brief for appellant.

Peter B. Krupp, with whom Thomas R. Murtagh, Joseph P. Crawford-

Kelly, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., were

on brief for appellee.

May 11, 1993

STAHL, Circuit Judge. In this appeal, plaintiff-

appellant Commercial Union Insurance Company ("CU")

challenges the district court's summary denial of its motion

to stay defendant-appellee Gilbane Building Company's

("Gilbane") counterclaim pending arbitration. Finding error

in the district court's decision, we reverse.

I.

Factual Background

During the latter half of the 1980's, Gilbane, a

general contractor, entered into thirteen subcontracts with

Thames Valley Steel Corporation ("TVS"), a structural steel

subcontractor, under which TVS agreed to perform structural

steel work for Gilbane on thirteen separate construction

projects in Massachusetts and Rhode Island. On each project,

CU acted as surety for TVS, issuing various performance,

labor, and material bonds guarantying TVS's proper completion

of its obligations. As such, each of the thirteen

construction projects was governed by at least three

contracts: (1) the prime contract between Gilbane and the

individual owner; (2) the subcontract between Gilbane and

TVS; and (3) CU's performance bond.

In 1990, TVS ceased doing business and, as a

result, defaulted on its obligations under each of the

thirteen subcontracts. Disputes then arose between CU and

Gilbane concerning CU's obligations as the guarantor of TVS'

-2-
2

performance on these projects. On August 16, 1991, CU

commenced this diversity action against Gilbane alleging that

Gilbane wrongfully withheld contract balances owed CU in

connection with the completion of the first twelve

construction projects. In its answer, Gilbane denied CU's

allegations and also brought a two-count counterclaim. In

Count I of its counterclaim, Gilbane alleged that, in

relation to the thirteenth construction project, TVS breached

the terms of its subcontract by failing to perform in a good

and workmanlike manner, and that CU breached the terms of its

performance bond by failing to correct TVS' work. In Count

II, Gilbane charged that CU committed unfair and deceptive

trade practices in violation of Mass. Gen. Laws Ann. ch. 93A,

2 and 11 (West 1984 and Supp. 1992) (hereinafter referred

to simply as "ch. 93A"), and unfair claim settlement

practices in violation of Mass. Gen. Laws Ann. ch. 176D,

3(9) (West 1987 and Supp. 1992), by failing "to effectuate a

prompt, fair and equitable settlement of Gilbane's claims . .

. ."

In response to Gilbane's counterclaim, CU filed a

reply denying any liability in connection with the thirteenth

project and amended its complaint to add a count alleging

that Gilbane committed unfair and deceptive trade practices

in violation of ch. 93A by withholding an undisputed amount

"solely in order to gain leverage with respect to a dispute

-3-
3

arising in connection with a different project." At that

time, CU also filed a third-party complaint against L.

Antonelli Iron Works and The Thompson and Lichter Company,

Inc., both of whom had entered into subcontracts with TVS to

perform certain services in connection with the thirteenth

construction project. In that complaint, CU alleged that the

third-party defendants were liable to CU for any amounts

Gilbane might recover against CU on Count I of its

counterclaim.

On November 6, 1991, CU filed the instant motion to

stay Gilbane's counterclaim pending arbitration, arguing that

the counterclaim was subject to an express arbitration

agreement.1 Gilbane opposed the motion to stay, contending

that the counterclaim was not subject to an arbitration

agreement, and in the alternative, that CU had waived its

right to arbitrate by filing the instant lawsuit. On May 18,

1992, the district court entered a margin order denying CU's

motion to stay. CU appeals from that decision.

II.

1. We think it important to emphasize that Count I of the
counterclaim concerns only the thirteenth construction
project. The other twelve projects, which are the basis for
the complaint by CU against Gilbane, are not implicated in
the counterclaim. The counterclaim, therefore, can be viewed
as separate and distinct from the complaint brought by CU
against Gilbane. Neither party has suggested that the
dispute as to the twelve other construction projects, which
form the basis for CU's complaint, be submitted to
arbitration.

-4-
4

Discussion

Although not raised by the parties, we first

explain the basis of our appellate jurisdiction. Section 3

of the Federal Arbitration Act ("FAA") contains a procedure

by which parties to an arbitration agreement may file a

motion to stay the trial of arbitrable claims pending

arbitration. See 9 U.S.C.A. 3 (West 1970). Pursuant to

that section of the statute, a district court must grant the

stay "upon being satisfied that the issue involved . . . is

referable to arbitration under such an agreement . . . ."

The FAA further provides that "[a]n appeal may be taken from

. . . an order . . . refusing a stay under section 3 of this

title . . . ." 9 U.S.C.A. 16(a)(1)(A) (West Supp. 1992).

As CU is appealing from a denial of a motion to stay under

section 3 of the FAA, we therefore have appellate

jurisdiction.

A. Arbitrability

The arbitrability of this dispute turns on the

interpretation of contractual terms, a question of law which

we can determine in the first instance. See, e.g., Fashion

House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir.

1989).

1. Relevant Contract Language

Gilbane's counterclaim is based upon CU's alleged

breach of its performance bond on the thirteenth project

-5-
5

("the Performance Bond"). Thus, the arbitrability of this

counterclaim depends upon whether there is language in that

contract subjecting disputes between Gilbane and CU to

arbitration.

Although the Performance Bond has no language

dealing with arbitration, it does contain a clause

incorporating the subcontract between Gilbane and TVS ("the

Subcontract"), which, in turn, has a clause incorporating the

prime contract between Gilbane and the owner of the

thirteenth project ("the Prime Contract"). It is the Prime

Contract that contains the arbitration clause. That clause

reads as follows:

All claims, disputes and other
matters in question arising out of, or
relating to this Agreement or the breach
thereof, . . . shall be decided by
arbitration in accordance with the
Construction Industry Arbitration Rules
of the American Arbitration Association
then obtaining unless the parties
mutually agree otherwise. This agreement
to arbitrate shall be specifically
enforceable under the prevailing
arbitration law by a three-member panel.

The Subcontract, which was drafted by Gilbane,

contains a clause incorporating certain provisions of the

Prime Contract:

[Gilbane] shall be bound to [TVS] by
the terms of this agre[e]ment, to the
extent that the provisions of the
contract documents between the owner and
[Gilbane] apply to the work of [TVS] as
defined in this agreement[.] [Gilbane]
shall assume toward [TVS] all the

-6-
6

obligations and responsibilities that the
owner, by those documents, assumes toward
[Gilbane]. [Gilbane] shall have the
benefit of all rights, remedies, and
redress against [TVS] which the owner, by
those documents, has against [Gilbane]. .
. .2

Finally, the Performance Bond has a clause

incorporating the Subcontract by reference: "Whereas, [TVS]

has by written agreement . . . entered into a [S]ubcontract

with [Gilbane] . . . which [S]ubcontract is by reference made

a part hereof . . . ."

2. Relevant Law

In deciding whether a chain of incorporation

rendering Gilbane's counterclaim arbitrable exists within

these three contracts, we are mindful of the strong federal

policy favoring arbitration agreements, a policy which

requires us to resolve "any doubts" concerning arbitrability

in favor of arbitration. See Moses H. Cone Memorial Hosp. v.

Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). See also J

& S Constr. Co., Inc. v. Travelers Indem. Co., 520 F.2d 809,

810 (1st Cir. 1975) (construing incorporation language in a

subcontract broadly in light of "the policy favoring

arbitration"). This policy applies "whether the problem at

hand is the construction of the contract language itself or

2. The subcontract defines "contract documents" to include
"the agreement between the owner and [Gilbane], the
conditions of the agreement between the owner and [Gilbane],
general conditions, supplementary, special and other
conditions . . . ."

-7-
7

an allegation of waiver, delay, or a like defense to

arbitrability." Moses H. Cone, 460 U.S. at 25.

In a remarkably similar case, the Sixth Circuit

held that a chain of incorporation running through a prime

contract, a subcontract, and a performance bond rendered

disputes under the performance bond subject to the prime

contract's arbitration clause. Exchange Mut. Ins. Co. v.

Haskell Co., 742 F.2d 274, 275-76 (6th Cir. 1984). Like the

Performance Bond at issue here, the bond in that case did not

itself contain an arbitration clause. Rather, the bond in

Haskell incorporated the subcontract by reference, (employing

incorporation language almost identical to that involved

here), which, in turn, incorporated the prime contract by

reference. Id. The incorporation clause in that subcontract

read as follows: "Subcontractor hereby assumes the same

obligations and responsibilities with respect to his

performance under this Subcontract, that Contractor assumes

towards Owner with respect to his performance on the [prime]

[c]ontract." Id. at 275. The prime contract in Haskell

contained an arbitration provision almost identical to that

in the Prime Contract at issue here. Id.

Without reference to the federal policy requiring

it to construe any doubts in favor of arbitrability, the

Sixth Circuit nevertheless reasoned that the incorporation

-8-
8

language in the performance bond and subcontract was broad

enough to include the prime contract's arbitration agreement:

Here, the performance bond
specifically referred to and incorporated
the subcontract. The subcontract
provides that the same obligations and
responsibilities apply in the subcontract
as apply in the [prime] contract. And,
finally, the [prime] contract provides
that there is a duty to arbitrate. Thus,
the performance bond incorporates by
reference the subcontract, the
subcontract incorporates by reference the
[prime] contract[,] and hence[,] the duty
to arbitrate.

Id. at 276 (relying on J & S Constr., 520 F.2d at 810).

If anything, the language in the Subcontract

incorporating the terms of the Prime Contract is even broader

than that in the Haskell subcontract. The Subcontract

provides that, to the extent the Prime Contract (with all its

attendant conditions) applies to the work of TVS, Gilbane

"shall assume toward [TVS] all the obligations and

responsibilities" that the owner assumed toward Gilbane under

the Prime Contract. (Emphasis added). The Subcontract

further states that "[Gilbane] shall have the benefit of all

rights, remedies, and redress against [TVS] which the owner,

by [the contract documents], has against [Gilbane]." The

parties do not dispute that one of the obligations which

Gilbane assumed toward the owner under the Prime Contract was

to submit all disputes arising out of the contract to

arbitration. Nor do they dispute that the bundle of "rights,

-9-
9

remedies, and redress" given the owner under the Prime

Contract included the right to submit all claims relating to

that contract to arbitration. Accordingly, we find that the

Subcontract bound Gilbane to arbitrate disputes relating to

the work of TVS.3 Because the Performance Bond explicitly

incorporated by reference the terms of the Subcontract, we

further find that Gilbane and CU similarly bound themselves

to submit disputes arising under the Performance Bond to

3. In support of its contention that the language in the
Subcontract should be read narrowly, Gilbane points to the
clause in that contract expressly granting Gilbane "the
benefits of all rights, remedies, and redress against [TVS]
which the owner, by [the Prime Contract], has against
[Gilbane]." Because the Subcontract does not contain a
parallel clause expressly granting TVS "the benefit of all
rights, remedies, and redress" under the Prime Contract,
Gilbane contends that the parties did not intend for TVS to
have the same right to subject disputes under this contract
to arbitration. We do not agree.
First, this argument ignores the immediately preceding
clause which states that Gilbane "shall assume toward [TVS]
all the obligations and responsibilities that the owner, by
[the Prime Contract], has against [Gilbane]." As explained
above, we interpret this clause to impose upon Gilbane the
duty to arbitrate "all disputes relating to [the Prime
Contract]," an obligation assumed by the owner under the
Prime Contract. Second, adopting Gilbane's cramped reading
of this language would run counter to the clearly enunciated
federal policy of interpreting "any doubts" in contractual
language in favor of arbitration. Moses H. Cone, 460 U.S. at

24-25. Finally, because Gilbane drafted the subcontract, we
construe any ambiguities in that contract against it. See,

e.g., LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.,

739 F.2d 4, 7 (1st Cir. 1984).

-10-
10

arbitration. To the extent that the district court held

otherwise, we reverse.4

B. Waiver

Gilbane alternatively contends that, even if the

counterclaim is arbitrable, CU waived its right to arbitrate

that claim based upon its pretrial participation in this

lawsuit. This contention we find meritless.

In deciding this issue, we first discuss the

appropriate standard of review. As the district court

decided the arbitrability question by margin order, we have

no predicate factual findings to review. In fact, it is

possible that the district court did not reach the question

of waiver but decided against CU solely on the basis of its

4. To support its position that the district court's refusal
to grant the stay was correct, Gilbane relies upon a series
of cases which, it asserts, stand for the proposition that
prime contract provisions unrelated to the work of the
subcontractor are not incorporated by reference into a
subcontract. See Washington Metro. Area Transit Auth. v.

Norair Eng'g Corp., 553 F.2d 233, 235-36 (D.C. Cir. 1977);

John W. Johnson, Inc. v. Basic Constr. Co., Inc., 429 F.2d

764, 774-75 (D.C. Cir. 1970); United States v. Fryd Constr.

Corp., 423 F.2d 980, 983-84 (5th Cir.), cert. denied, 400

U.S. 820 (1970); United States Steel Corp. v. Turner Constr.

Co., 560 F. Supp. 871, 873-74 (S.D.N.Y. 1983). None of these

cases, however, involved the incorporation of an arbitration
clause. Indeed, in one of the cases relied upon by Gilbane,
the court explicitly distinguished cases involving
arbitration clauses as invoking the "congressional policies
favoring arbitration . . . ." See Washington Metro., 553

F.2d at 236. In light of Haskell, a case on all fours with

this one, we find Gilbane's reliance upon this line of cases
unpersuasive.

-11-
11

interpretation of the contractual language. In any event,

the facts concerning CU's pretrial participation in the

lawsuit are undisputed. As a result, the question of waiver

is one of law, and we review it de novo. See Page v.

Moseley, Hallgarten, Estabrook & Weeden, Inc., 806 F.2d 291,

294 n.2 (1st Cir. 1986), overruled on other grounds sub nom.

Shearson/American Express, Inc. v. McMahon, 482 U.S. 220

(1987).

In deference to the policies favoring arbitration,

"courts have stated that `waiver is not to be lightly

inferred, and mere delay in seeking arbitration without some

resultant prejudice to a party cannot carry the day.'" See

id. at 293 (quoting Rush v. Oppenheimer & Co., 779 F.2d 885,

887 (2d Cir. 1985)). See also Sevinor v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., 807 F.2d 16, 19 (1st Cir. 1986)

("In order for plaintiffs to prevail on their claim of

waiver, they must show prejudice."); J & S Constr., 520 F.2d

at 809-10 (upholding district court's finding of no waiver

where there had been "no showing of prejudice").

Although Gilbane made no claim below that it would

be prejudiced by a stay of its counterclaim, it asserts on

appeal that it would suffer prejudice on two bases: (1) that

it could not properly "defend" Count I (the contract claim

for amounts allegedly owed CU on twelve of the thirteen

construction projects) and Count II (CU's ch. 93A claim)

-12-
12

without its counterclaim; and (2) that it would be forced

into duplicative litigation. We discuss these contentions in

turn.

Gilbane first argues that it would suffer prejudice

from having to defend against Count I of CU's complaint

without its counterclaim. Accepting this contention would

require, in essence, a finding that the thirteen construction

projects are factually inseparable. This is simply not the

case. Suppose, for instance, that the counterclaim proceeds

to arbitration and is decided in Gilbane's favor. Assume

further that the underlying lawsuit results in an award to

CU. Under that scenario, the arbitration award could act as

a stipulated setoff from the amount awarded CU in district

court.5 We are unable to imagine a scenario in which

Gilbane would suffer prejudice from having to defend Count I

of CU's complaint in the underlying lawsuit without its

counterclaim. Nor has Gilbane outlined such a scenario.6

5. We note that Gilbane's attorney conceded as much during
oral argument.

6. Gilbane also argues that, because it pleaded the
substance of its counterclaim as an affirmative defense in
its answer to the complaint, it should be permitted to
litigate the substance of that claim in the underlying
action. Whether we characterize the substance of Gilbane's
claim as a "counterclaim" or a "setoff defense," however,
makes no difference for the purposes of determining whether
Gilbane will theoretically be prejudiced by severing it from

the underlying lawsuit. Second, and more important, Gilbane
is, in our opinion, relying upon creative pleading to make an
end run around an arbitration agreement. We have previously
rejected a party's reliance upon procedural gamesmanship to

-13-
13

We therefore find unpersuasive its belated contention that

one might exist.

Gilbane also asserts that it would suffer prejudice

by having to defend against Count II of CU's complaint

without its counterclaim. Again, Gilbane has failed to

provide an example of how it might be prejudiced. It appears

to be arguing, instead, that it would be judicially

inefficient to litigate CU's ch. 93A claim in one forum and

Gilbane's ch. 93A claim in another.7 While Gilbane may be

correct, we fail to see how any resulting judicial

inefficiency would prejudice Gilbane.8 Cf. Page, 806 F.2d

avoid the dictates of an arbitration agreement. Cf. Hilti,

Inc. v. Oldach, 392 F.2d 368, 373 n.2 (1st Cir. 1968) ("If

arbitration defenses could be foreclosed [by creative use of
the joinder rules], the utility of such agreements would be
seriously compromised."). We do so again today.

7. At one point in its brief, Gilbane states that it would
"be at risk of inconsistent verdicts . . . ." Gilbane has
not, however, offered either an explanation of this
perfunctory assertion or an example of a scenario in which it
could occur. As such, we do not address it further. See

United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992)

(reiterating well settled rule in this circuit that arguments
adverted to on appeal in "a perfunctory manner, unaccompanied
by some developed argumentation," are deemed waived) (quoting
Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 734 (1st

Cir. 1990)).

8. In any event, considerations of judicial efficiency are
not a sufficient basis on which to affirm the district
court's denial of the motion to stay. See, e.g., Seguros

Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855, 862 (2d

Cir. 1985) (holding that a court "may not refuse to grant a
stay [of a claim pending arbitration] based on considerations
of judicial economy"); Surman v. Merrill Lynch, Pierce,

Fenner & Smith, 733 F.2d 59, 63 (8th Cir. 1984) (similar);

Dickinson v. Heinold Sec., Inc., 661 F.2d 638, 644-45 (7th

-14-
14

at 294-95 (finding no prejudice despite plaintiffs' claim

that compelled arbitration would force them to "restart the

entire [pretrial preparation] process before a new tribunal"

almost two years after complaint was filed).

Gilbane also argues that it would suffer prejudice

by having to litigate the same facts in two separate

proceedings, and having "to incur increased costs as a result

of having to proceed in two arenas." This argument rests on

the faulty premise that litigation of the counterclaim and

CU's underlying claims would require the adjudication of

"identical factual and legal issues." See supra pp. 11-12.

Moreover, any added costs that Gilbane would incur to

arbitrate its counterclaim were bargained for by Gilbane. As

such, Gilbane's final attempt to persuade us that it will

suffer undue prejudice falls well short of the mark.

III.

Conclusion

In sum, we find that Gilbane's counterclaim was

subject to an express agreement to arbitrate, and that CU did

not waive its right to arbitrate that claim. Accordingly, we

reverse the district court's denial of CU's motion to stay

Gilbane's counterclaim pending arbitration and remand for

proceedings consistent with this opinion.

Reversed and remanded. No costs.
Reversed and remanded. No costs.

Cir. 1981) (similar).

-15-
15