**McKINNEY DRILLING COMPANY, Plaintiff,**

**v.**

**The COLLINS COMPANY, INC. and United States Fidelity and Guaranty Co., Defendants.**

Civ. A. No. 80–G–0814–S.

United States District Court, N. D. Alabama, S. D.

June 15, 1981.

J. Ross Forman, III, Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for plaintiff.

William D. Coleman, Capell, Howard, Knabe & Cobbs, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

GUIN, District Judge.

This action is for breach of contract, and for recovery under a labor and material payment bond pursuant to § 39–1–1 of the Code of Alabama (1975). Jurisdiction over this action exists under 28 U.S.C. § 1332 by reason of the diversity of citizenship and the amount in controversy. After hearing the evidence at trial and considering the briefs of counsel and applicable law, this court incorporates in this memorandum opinion the appropriate findings of fact and conclusions of law, as authorized by Rule 52 of the Federal Rules of Civil Procedure.

This controversy stems from a subcontract entered into by the parties under which the plaintiff, McKinney Drilling Company (McKinney), agreed to install eight 72-inch diameter drilled caissons [1] for the defendant, The Collins Company (Collins). This subcontract comprised a portion of the work to be performed in the construction of the Dry Creek Wastewater Treatment Plant near Decatur, Alabama. Collins served as the general contractor of that project for the City of Decatur.

The City had previously retained Paul B. Krebs Associates, Inc., consulting engineers, to prepare the construction contract documents, including drawings and specifications, and to oversee the work. After the documents were completed, the project was put out for bids. The Collins Company intended to bid on the project and therefore solicited bids from subcontractors on various aspects of the work. McKinney specializes in drilling work, usually as a subcontractor, and was interested in doing the caisson work for the project.

On April 26, 1979, the date of the bid opening, Hal McKewen, Alabama district manager for McKinney, telephoned The Collins Company to provide it with a bid for installing eight 72-inch diameter caissons at the Dry Creek project. He spoke with a representative of Collins who was receiving telephone bids from subcontractors for that job. McKewen advised him that McKinney's base price was $110,960.00, and that the base price included all earth excavation to the depth indicated in the caisson drawings, the specified test holes, and one foot of rock excavation per caisson.

Collins was the low bidder and was subsequently awarded the contract by the City, which was not executed until July 24, 1979.

On May 21, 1979, McKinney sent Collins its written proposal for the base price of $110,960.00. The proposal stated that it included all earth excavation, the furnishing and placing of all caisson concrete, the specified test holes, and one foot of rock excavation per caisson. The proposal specified that it be made a part of the subcontract, and also stated that unit prices for additional earth and rock excavation would be negotiated before the work began. McKinney's written proposal also required that final payment for the caisson work would be due sixty days after McKinney completed its portion of the work.

On July 6, 1979, L. D. Collins, president of The Collins Company, discussed with Hal McKewen on the telephone the unit prices for additional earth and rock excavation. It was agreed that the unit prices would be $155.00 per linear foot of earth excavation and concrete fill, and $575.00 per linear foot of rock excavation and concrete fill, the adjustment to be made for more or less excavation. [2]

---

1. A caisson is a shaft of concrete in the ground which is frequently used as support for buildings. Basically a caisson is installed by drilling a shaft through earth and rock by using a special drilling machine referred to as an auger, then pouring the concrete.

2. Mr. Collins testified at trial that McKewen voluntarily told him that the unit prices were needed in case the elevations were changed. Mr. McKewen disputed this testimony and the court is not persuaded by Mr. Collins' version of the telephone conversation.

In July, 1979, McKinney received the subcontract for the caisson work. The subcontract was prepared by L. D. Collins, on Collins' standard subcontract form, except for McKinney's proposal which was incorporated into the subcontract. The subcontract was dated July 16, 1979.

On July 24, 1979, the same date it executed the general contract, Collins posted the Labor and Material Payment Bond with the City, as required by § 39–1–1 of the Code of Alabama (1975). The defendant United States Fidelity and Guaranty Company (USF&G) executed the bond as surety.

McKinney commenced the caisson work on October 10, 1979, and completed pouring the concrete for the last caisson on November 20, 1979. On October 25, 1979, McKinney submitted to Collins its first application for payment which reflected that it had completed 25 percent of the caisson work. Collins paid McKinney the requested payment of $24,966.00 by check dated November 28, 1979.

On November 27, 1979, McKinney submitted to Collins its application for final payment. The application contained a worksheet showing the adjustments McKinney claimed should be made to the base price, and which amounted to an additional sum of $46,955.50 over the base price. These adjustments were recomputed in March of 1980, and mathematical errors were found in the November, 1979 worksheet. It was also discovered that Collins had not been billed for all of the test holes installed. The corrections lowered the additional amount to be added to the base price to $36,424.65. On March 24, 1980, McKinney sent the revised application for final payment to Collins along with the corrected worksheet showing the adjustments made to the base price. These adjustments resulted in a total subcontract price of $147,348.65. Since Collins had previously paid the sum of $74,966.00,[3] the final application for payment requested the sum of $72,418.65.

In early April, 1980, L. D. Collins informed Hal McKewen that The Collins Company would not pay the amount requested by McKinney. On April 15, 1980, McKinney notified USF&G by certified mail, pursuant to § 39–1–1 of the Code of Alabama (1975), that Collins owed it the sum of $72,418.65 for caisson work performed at the Dry Creek Wastewater Treatment Plant. USF&G acknowledged receipt of McKinney's notice letter. No payment was made by USF&G nor Collins within 45 days. The efforts of the parties' counsel to settle the dispute failed, and suit was filed on June 24, 1980.

On July 14, 1980, Collins paid McKinney the amount of $34,973.05, which Collins recognized as due. Added to the previous payments, the amount paid by Collins to McKinney totalled $109,939.05. This amount reflected the original contract price, plus an agreed extra of $636.00 for test holes, but minus adjustment of $1,656.95 for less drilling and concrete due to minor changes in caisson elevations.

The case proceeded to trial without any further payments being made. The defendants stipulated at trial that if the court found Collins liable to McKinney, then USF&G would also be liable to McKinney by virtue of the Labor and Material Payment Bond.

The general issue before the court surrounds the interpretation of the subcontract between McKinney and Collins. The court is of the opinion that McKinney correctly interprets the subcontract as requiring the base price to be adjusted for additional rock

---

**3.** Collins paid $24,966.00 in November, 1979, on McKinney's first application for payment. On January 3, 1980, after receiving McKinney's original request for final payment, Collins sent McKinney a check for $50,000.00 as partial payment, pending the resolution of a possible problem with the concrete in caisson number eight. On January 16, 1980, the project engineer notified Collins that, although he could not give unqualified approval to caisson number eight, it appeared that the caisson would be acceptable. Collins made no additional payments to McKinney, however, until July, 1980, after this suit had already been filed, when Collins sent McKinney its "final" payment of $34,973.05. The total amount paid by Collins presently stands at $109,939.05.

excavation, and therefore enters judgment in favor of McKinney.

To properly interpret the entire subcontract involved requires an examination of the components of the subcontract, which include the subcontract itself, plus the proposal by McKinney, and the general contract and specifications, made a part of the subcontract by incorporation. Applying the general rule of construction that a contract is interpreted as a whole, Restatement of Contracts § 235(c) (1932), the court finds the subcontract ambiguous and that it contains inconsistent provisions. For example, Article IV of the form subcontract providing claims procedures for extra work may be read as in conflict with the typewritten terms of the subcontract and proposal requiring price adjustment for additional excavation. The provisions of the proposal and typewritten parts of the subcontract distinguishing between earth and rock excavation differ with provisions in the specifications to the effect that all excavation is to be "unclassified", which would make it immaterial whether excavation was of rock or earth. These are only a few of the problems that have been raised in trying to reconcile the various parts of the subcontract documents.

The general rules of construction, when applied to these contract documents, however, supply a clear reading which supports the plaintiff's position. First, when a conflict exists between the general and specific provisions, the specific clauses control. *Western Oil Fields, Inc. v. Pennzoil United, Inc.*, 421 F.2d 387, 389 (5th Cir. 1970); *Atlanta National League Baseball Club, Inc. v. Kuhn*, 432 F.Supp. 1213, 1224 n.9 (N.D. Ga. 1977); Restatement of Contracts § 236(c) (1932). Further, written clauses govern printed clauses, since it is presumed that written provisions received stricter attention from the parties. *Bartlett & Company, Grain v. Merchants Co.*, 323 F.2d 501, 506 (5th Cir. 1963); *Industrial Machinery, Inc. v. Creative Displays*, 344 So.2d 743, 749 (Ala. 1977); Restatement of Contracts § 236(e) (1932). Finally, ambiguous terms are to be construed most strongly against the party who drafted the agreement. *Za-*

*pata Marine Service v. O/Y Finnlines, Ltd.*, 571 F.2d 208, 209 (5th Cir. 1978); *Tenneco, Inc. v. Greater Lafourche Port Commission*, 427 F.2d 1061, 1065 (5th Cir. 1970), cert. denied, 400 U.S. 904, 91 S.Ct. 142, 27 L.Ed.2d 141 (1970); *McDowell-Purcell, Inc. v. Manhattan Construction Co.*, 383 F.Supp. 802, 805 (N.D. Ala. 1974), aff'd without opinion, 515 F.2d 1181 (5th Cir. 1974), rehearing denied, 520 F.2d 943 (1975), cert. denied, 424 U.S. 915, 96 S.Ct. 1115, 47 L.Ed.2d 320 (1976); *Molton & Williams, Inc. v. St. Paul Fire & Marine Insurance Co.*, 347 So.2d 95, 99 (Ala. 1977); Restatement of Contracts § 236(d) (1932).

■ Applying these general principles, the specific language of the contract, on which the plaintiff relies, controls the more general provisions on which the defendant relies. Further, the typewritten language of Article I of the subcontract takes priority over the boiler plate provisions of the form subcontract and specifications. And finally, any remaining ambiguities or inconsistencies must be resolved against The Collins Company which drafted the agreement.

The court must now apply these rules of general application to the specific problem areas of the subcontract agreement. The subcontract, executed by McKinney and Collins, was prepared on Collins' standard subcontract form. Mr. Collins, president of the defendant company, testified that the subcontract was made to conform with the specific agreement between the parties by typing the necessary modifications in the space provided in Article I. The language typed in Article I is, therefore, the language with which the court is most concerned in gleaning the intentions of the parties to the subcontract. The typed language in the contract between Collins and McKinney provides:

> Install eight (8) 72″ diameter Drilled Caissons per Subcontractor's proposal of May 21, 1979 attached hereto and made part of this agreement subject to the conditions and definitions contained herein.

Installation to depths indicated on the Caisson detail shown on contract drawing sheet 27 of 268.

Caissons to be installed from working level of Elevation 560.5. Temporary casing for four (4) Caissons with top elevation 535.48 to be removed by Contractor with salvage being the property of Subcontractor.

Final Billing to be adjusted as follows:
    a. More or less drilling and concrete fill in earth @ $155.00 per lineal foot.
    b. More or less drilling and concrete fill in rock @ $575.00 per lineal foot.

Caissons can be installed after September 15, 1979 at Subcontractor's option.

■ The first problem area presented by this crucial language concerns the weight to be given McKinney's proposal which is ". . . subject to the conditions and definitions contained herein." This "subject to" language aroused much controversy before, during, and after trial. Collins argues that this phrase made the proposal "subordinate to", "subservient to", or "limited by" the printed provisions of the subcontract, the general contract and the specifications. The defendants then cling to the boiler plate language of Article II of the subcontract which provides, in effect, that the contractor shall have the same rights and privileges against the subcontractor as the owner has against the contractor.

McKinney, on the other hand, contends that the words "subject to" have the legal effect of incorporating additional terms and conditions by reference, and the incorporated terms are placed on an equal footing with the other terms of the agreement. The "subject to" language should therefore be read, according to McKinney, as merely placing the parties on notice that the proposal was not the whole agreement and that other provisions had to be considered.

To interpret this clause as Collins would have the court do, would work a great injustice upon a subcontractor like McKinney. The proposal itself required that it be made a part of the contractual agreement, and the evidence indicated that the agreement probably would not have been executed by McKinney if the proposal were not so incorporated. If this language were interpreted as making the proposal subservient to all the boiler plate provisions of the subcontract, the general contract and the specifications, the general contractor would be allowed to create the appearance of accepting a subcontractor's proposal, but, through the use of boiler plate language never intended to be applicable to a proposal such as the one made by McKinney, would in effect be binding the subcontractor to terms to which the subcontractor did not agree. The court will not allow Collins to thus circumvent the clearly expressed intent of McKinney.

Further support for McKinney's position is found in the case of *BBCI, Inc. v. Canada Dry Delaware Valley Bottling Co.*, 393 F.Supp. 299 (E.D. Pa. 1975). That case involved the issue whether the terms of a master franchise agreement controlled the terms of the subfranchise agreement since the subfranchise contract was "subject to" the master agreement. The court specifically stated that ". . . it is clear that being 'subject to' the master franchise means nothing more than being incorporated by reference. All the terms stand on an equal footing, and neither set of terms supersedes the other." 393 F.Supp. at 303. The *BBCI* court did not have to determine which provisions would control inconsistencies because it found no inconsistencies to exist.

When the general rules of construction previously mentioned are applied to the subcontract in question, this court finds that no real inconsistencies exist between the terms of the proposal and those of the other parts of the subcontract. Thus this court, as the *BBCI* court, does not have to determine which provisions would control in the event of inconsistent provisions.

The second problem area relevant to interpreting the provisions of Article I involves the provision for payment. The typed portion of the agreement provides that final billing would be adjusted for more or less drilling in earth or rock at specified unit prices. Collins contends that such adjustment would only be made if

McKinney were required to drill deeper than indicated in the specifications, that the contract price was a lump-sum price, and that the contract specified that all excavation was to be unclassified.[4] McKinney counters that the language of the typewritten portion of the subcontract, when read together with its proposal, indicates that price adjustments were to be made if it had to excavate more or less earth or rock than covered in its bid. The resolution of this issue again involves examining various portions of the subcontract documents, as well as testimony, to extract the intention of the parties.

Collins first asserts that the contract price of $110,960.00 constitutes a lump-sum price and that it would be adjusted only if the caisson elevations changed. An examination of McKinney's proposal and the typed portion of the subcontract, particularly in light of the established custom and practice in the caisson business, reveals such a contention to be erroneous.

The testimony of witnesses familiar with the caisson industry clearly established that one of two methods is customarily used for quoting caisson work. The most common method involves quoting the work at a price based on the linear feet of earth and rock to be excavated as indicated in the caisson specifications and structural drawings. Adjustments are then to be made to the base price at the final billing to reflect the linear feet of earth and rock actually excavated in constructing the caissons. If less earth or rock is excavated, a credit is given against the base price; if more earth or rock is excavated than included in the base price, then an addition is made to the price.

The second method of quoting is on a flat per unit price basis (a linear foot basis) with separate quotations for the costs of moving on and off the job and for other expenses. These separately-quoted expenses would be a part of the base price under the first method of quoting.

The evidence definitely indicated that unpredictable subsurface conditions exist in Alabama north of Birmingham, the area in which this subcontract was performed. Due to the unpredictability of the subsurface conditions, it is highly unlikely that a subcontractor would bid for a caisson job on a lump-sum basis, for to do such would expose the subcontractor to more exorbitant risks than would otherwise exist in this high-risk business.

An examination of McKinney's written proposal conclusively establishes that its bid was according to the first and most commonly used method of quoting—a base price to which adjustments would be made to reflect the actual linear feet of earth and rock excavated.[5] The written proposal indicates that the eight drilled caissons would be installed for a base price of $110,960.00. The proposal states that the base price included all earth excavation (meaning earth excavation from the top of the caisson to designated elevation 523.03) and one foot of rock excavation per caisson. Also, the proposal specifically provides that unit prices for additional earth excavation and rock excavation would be negotiated before the work commenced. The court finds this language clearly indicative that the bid reflected a base price, not a lump-sum price.

Collins asserts that the subcontract price had to be a lump-sum because the general contract documents required the general contractor to bid and contract on a lump-sum basis, including installation of caissons, with additional payment being due only for extra work in the event the caissons went deeper than the estimated elevations. The court cannot accept the contention that the general contract documents bound the subcontractor to a lump-sum price merely because the general contractor had to bid in such a manner.

Collins further argues that its lump-sum contention finds support in the fact that the plans and specifications provided that all

4. "Unclassified excavation" means, in effect, that it is immaterial, for pay purposes, whether the material excavated is earth or rock.

5. That McKinney's bid followed this method finds further support in McKinney's "take-off" sheet used to prepare its bid.

excavation was to be unclassified, and therefore no adjustment could be made to the price based upon the materials encountered.

The testimony at trial from various witnesses sufficiently demonstrated that the portions of the general contract documents relied upon by Collins were inapplicable to the caisson work performed by McKinney. First, the sections upon which Collins rests its claim for an unclassified, lump-sum price are found under the portion of the specifications entitled "Instructions to Contractors." The testimony of the witnesses familiar with the caisson industry indicated that this portion applied only to general contractors, not to subcontractors like McKinney. The evidence revealed that it is the custom and practice of caisson subcontractors to skim the specifications looking for specific references to caisson work. If none are found in the specifications, the structural drawings would then be consulted. That is what Hal McKewen did in formulating McKinney's bid. The initial specifications contained no reference to caissons but instead the caisson work was detailed in the structural drawings. A particular caisson specification was issued by way of addendum on March 7, 1979, which did not specify any requirements of a lump-sum bid nor of unclassified excavation.

The caisson subcontractors who testified reviewed all these documents and concluded that the structural drawings and addendum were the only portions applicable to caisson work—none of which contain references to the method of bidding nor the type of excavation. Further, these witnesses also reviewed the provisions under "Instructions to Contractors" and testified that they only applied to mass excavation, and not to caisson drilling excavation.

▪ The testimony of Mr. Pat Daughtery, the engineer who drafted the documents for Krebs significantly strengthens the plaintiff's position. He testified that he had never before been involved with caisson work, and had no experience in drafting caisson specifications. All of his knowledge of excavation concerned "mass excavation."[6] The specifications Daughtery used for the Dry Creek job were taken from specifications for other jobs which only involved mass excavation. The provision concerning unclassified excavation, found in sections which the drafter admitted applied to mass excavation, cannot rationally be held applicable to caisson work. Jim Anthony, a general contractor familiar with excavation work, testified that it is much more difficult to excavate rock in caisson work than in mass excavation because of the size of the area. In caisson drilling, the work is more confined and it is necessary to carefully excavate the rock in order to keep the shaft cylindrical. The court therefore concludes that the lump sum and unclassified excavation requirements of the specifications do not control the subcontract for caisson work involved here.

The court further finds a significant inconsistency in Collins' contention that the contract was a lump-sum proposal. When Collins made what it considered to be the last payment due McKinney in July, 1980, Mr. Collins adjusted the amount due *downward* for 10.69 feet less earth excavation performed. If the contract had, in fact, been for a lump sum, there would have been no grounds for such an adjustment. Collins, by taking the adjustment for less earth excavated, apparently understood the significance of the unit prices which he included in the subcontract. He willingly made the downward adjustment to what he claims is a lump-sum price, yet refuses to allow such adjustments for additional rock encountered.

Further, defendants' contention that the provisions of the specifications control over the other terms of the subcontract in this case is legally unsound. Numerous cases have held that a subcontractor is free to contract in any manner that it desires; and if the specific provisions of the subcontract

---

**6.** Mass excavation generally involves the use of large machinery to excavate large areas. Road excavation is an example of mass excavation.

conflict with the plans and specifications, or with the general contract between the prime contractor and the owner (all of which are incorporated into the subcontract), the terms of the subcontract prevail. *E. g., John W. Johnson, Inc. v. Basic Construction Co.*, 429 F.2d 764 (D.C. Cir. 1970); *Perry v. United States*, 146 F.2d 398 (5th Cir. 1945).

The analogous case of *Perry v. United States*, 146 F.2d 398 (5th Cir. 1945), lends considerable strength to the position that the terms of the general contract, specifications and plans incorporated by reference were subservient to the provisions of the subcontract. In that case, the subcontractor sued the general contractor for withholding funds. The general contractor withheld the funds because the subcontractor refused to perform outside electrical work which the general contractor contended was part of the work the subcontractor agreed to perform. The general contractor's argument centered on the fact that the subcontract had referenced the general contract, and had bound the subcontractor to the general contractor to the same extent that the general contractor was bound to the owner. The owner's representative determined that the outside electrical work was included in the plans and specifications which defined the work to be done by the subcontractor. The general contractor was bound by this determination and contended that the subcontractor was also bound. The district court found that the subcontractor reasonably had not considered outside electrical work to be included in the plans and specifications and, therefore, had not agreed to perform this work in the subcontract. The district court entered judgment for the subcontractor, and on appeal the Fifth Circuit affirmed. 146 F.2d at 399, 400.

In affirming the district court, the Fifth Circuit specifically held that the provisions of the general contract and the plans and specifications were subservient to the terms of the subcontract. The court stated:

> ... while a reference in a subcontract to the provisions, plans and specifications of a general contract imports them into a subcontract where not inconsistent with its terms, it is quite well settled that such a reference is not effective beyond this, and that if the subcontract contains words of definite limitation, they will be given effect and the reference limited accordingly.

146 F.2d at 400. *In accord, John W. Johnson, Inc. v. Basic Construction Co.*, 429 F.2d 764, at 772, 776 (D.C.Cir. 1970).

■ It is also well established law that references to the general contract and the plans and specifications in the manner done in the subcontract involved in this case only incorporate the provisions thereof which relate to the character and manner of work to be performed. Such references do not incorporate administrative provisions or pay provisions of the general contract or the plans and specifications. *Edward E. Morgan Co. v. United States*, 230 F.2d 896 (5th Cir. 1956); *John W. Johnson, Inc. v. Basic Construction Co.*, 429 F.2d 764 (D.C.Cir. 1970).

The *Basic Construction* case is particularly analogous to the case at bar since the subcontract provisions incorporating the general contract were similar to the subcontract provisions in Article II(a), (b), of the subcontract, and the general conditions of the specifications requiring such a provision in the subcontract were similar to provisions of the general conditions in the Dry Creek specifications.[7] In *Basic* the subcontractor stopped work when the general con-

7. General Condition 19 for the Dry Creek project is entitled "Subcontractors" and provides:

The Contractor shall bind all subcontractors to the terms of the General Conditions and Contract Documents insofar as they are *applicable to work* under subcontract, and shall insert in all agreements with Subcontractors appropriate provisions such as to give the Contractor the same power as regards terminating any subcontract that the owner may exercise over the Contractor under any provision of the Contract Documents.

Nothing contained in the Contract Documents shall be construed as creating any contractual relationship between any Subcontractor and the Owner. [Emphasis added.]

tractor refused to give it a commitment to pay for work which the subcontractor considered to be extra. Basic contended that it was not required to give the subcontractor such a commitment since the provisions of its general contract, which were incorporated into the subcontract, did not require such. Further, Basic argued that such a commitment was not required since the owner had concluded that the work did not constitute extra work. Basic argued that this finding by the owner bound not only itself but the subcontractor since the general contract had been made a part of the subcontract. The D.C. Circuit found the work to be extra and held that the subcontractor was justified in stopping work when Basic would not commit to pay for the extra work. The court rejected all of Basic's contentions and stated:

> ... even if the prime contract was fully incorporated into the subcontract, its general provisions would not overcome the specific provision of the subcontract dealing with "Changes" which required Basic to give a written order for the work which made "allowance" for the increased cost. Furthermore, the prime contract was only incorporated for the *limited purpose* of requiring compliance with the terms and provisions of the prime contract insofar as same were applicable to the *work* to be performed and did not extend to require adherence by the subcontractors to administrative remedies and decisions thereunder by the parties to the prime contract.

The provision in the subcontract incorporating the prime contract by reference was required by the General Conditions of Basic's contract with the Fund which provided:

> 17. *Subcontractors.* * * * The Contractor shall execute with each of his subcontractors * * * a written agreement which shall bind the latter to the terms and provisions of this contract insofar *as such terms and provisions are applicable to the work* to be performed by such subcontractors. [Emphasis added.]

This binds the subcontractor to the terms and provisions applicable "to the work", and we construe this to mean to the character and manner of the work to be done by the subcontractor. *Guerini Stone Co. v. P. J. Carlin Construction Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916). Also, the subcontractor was not a party to the prime contract and he was not made privy to its provisions by having it incorporated by reference into its subcontract. In fact, the prime contract specifically provided that none of its provisions shall be construed as creating any contractual relation between the Fund and any subcontractor. (General Conditions, 17, Subcontractors.) Under such circumstances we have no difficulty in concluding that the fact that the prime contract was incorporated by reference into the subcontract did not justify an interpretation that would excuse Basic *from the requirement of issuing a change order committing itself to pay for the extra work* or require that Johnson be bound to Basic's position in any dispute vis-a-vis the Fund.

429 F.2d at 772, 773.

As in the *Basic Construction* case, all references in the present subcontract to the plans, specifications and the general contract are in connection with the work to be performed. Thus, these references are limited in application to indicating the character of the work to be performed.

Having thus considered all of the contract documents, the testimony presented at trial, and case authority, the court concludes that the typewritten provision in the subcontract providing for adjustments to final billing means what it says, regardless of any general contract terms which may appear to be to the contrary. The bid price of $110,960.00 is, therefore, to be adjusted, up or down, for more or less drilling and concrete fill in earth or rock than was included in McKinney's proposal. The proposal stated that it included one foot of rock excavation per caisson, or a total of eight feet of rock excavation. Further, the proposal stated that unit prices for addi-

tional earth and rock excavation would be negotiated before work commenced. Unit prices indeed were negotiated and appear in the typewritten portion of the subcontract as $155.00 per lineal foot for earth work and $575.00 per lineal foot for rock work. The court finds no merit in Collins' contention that these unit prices were to be applied only if excavation extended below the original bottom elevation of 522.03. The court concludes that McKinney is entitled to additional compensation at the rate of $575.00 per lineal foot of rock excavation which exceeded the eight feet included in its bid. In making that computation, however, Collins is also entitled to a credit for earth not excavated at the rate of $155.00 per lineal foot.

In determining the amount of additional compensation to which McKinney is entitled, it is necessary to resolve another issue which revolves around the proper definition of rock. The court has already concluded that the proposal, made the basis of the contract, includes a total of eight feet of rock and that the typewritten terms of the subcontract provides for price adjustments for more or less drilling and concrete fill in earth or in rock.

■ Collins contends that the definition of rock contained in the specifications governs. That definition, which defendant admitted at trial and in brief is a boiler plate definition, provides that boulders "of eight cubic feet or less shall not be classified as rock. Material that can be loosened, separated, or ripped by means of heavy duty power tools or excavating equipment shall not be classified as rock." Specifications § 2–02. The testimony clearly indicated that this boiler plate provision applies to mass excavation, but does not apply to caisson drilling. Since the specifications called for caissons of 72 inches in diameter, it is ludicrous to contend that to qualify as rock, a boulder would have to be more than eight cubic feet. Further, heavy duty power tools or excavating equipment are not used to loosen rock in 72 inch caissons.

■ The plaintiff presented much uncontradicted testimony by disinterested witnesses as to the custom and practice in the caisson industry concerning the accepted definition of rock. This evidence clearly demonstrated that it is the custom and practice in the caisson industry to consider as rock all material which cannot be excavated by use of a conventional earth auger, and which requires special tools, blasting or hand excavation. This is the definition which the court finds controlling in this case with regard to caisson drilling work. Additionally, it is the custom and practice to consider all earth seams, rock fragments, and voids encountered after rock excavation techniques are initially employed as constituting rock for pay purposes.

The testimony of those witnesses familiar with caisson work also clearly established that it is the custom and practice in determining the linear feet of rock excavated in drilling a caisson, to begin the measurement at the elevation where there is first refusal of the earth auger (top of the rock) and to continue the measurement to the bottom of the caisson. This method is used to measure the linear feet of rock excavation regardless of whether the rock fills the entire diameter of the hole or only a portion thereof. This method comprises a reasonable procedure since the amount of rock is measured and paid per vertical linear foot, and not per a volumetric measurement.

Caisson logs were kept by McKinney which reflect the first rock elevation. From that elevation to the bottom of the caisson reflects drilling and excavation in rock. This method of linear measurement comprises the customary method of determining the amount of rock excavated for pay purposes. These logs were approved by representatives from McKinney, Collins, and Krebs. Collins contends that since none of its men were present when McKinney struck rock, the caisson logs should not be used to calculate the amount of rock excavated. No showing was made at trial that the caisson logs were incorrect. Merely because Collins neglected to oversee the caisson drilling operation does not preclude the use of these caisson logs in determining the amount of rock excavated.

The caisson logs for each of the eight caissons were used to calculate the amount of earth and rock actually excavated. The linear feet of earth actually excavated was derived by totalling the linear feet of machine augering from the top of the caisson to the first rock elevation for each of the eight caissons. The linear feet of rock excavation was derived from the caisson logs by totalling the linear feet from first rock elevation to the bottom elevation for each of the eight caissons. At trial the defendants did not introduce any evidence to place in dispute the actual linear feet of earth and rock excavated in performing the work.

The amount of earth actually excavated totalled 110.76 linear feet, while the base price covered 199.68 linear feet,[8] leaving a difference of 88.92 linear feet for which Collins is entitled to a credit at $155.00 per linear foot. The base price included eight linear feet of rock, and McKinney actually excavated 93.71 linear feet of rock, and thus is entitled to an adjustment of $575.00 multiplied by 85.71 linear feet of additional rock excavated.

■ In so doing the above-referenced calculations, the court determines that Collins owes McKinney $36,424.65 for adjustments to the base price.[9] This amount, when added to the base price of $110,960.00, reveals a total contract price of $147,384.65. When the total amount of money paid by The Collins Company[10] is subtracted from this amount, plaintiff is entitled to recover from the defendants the sum of $37,445.60.

The plaintiff is also entitled to attorney's fees and statutory interest. The claim for attorney's fees arises under the provisions of the bond posted by Collins and USF&G, and under the provisions of § 39–1–1 of the Code of Alabama (1975). The amount of attorney's fees due will be determined at a subsequent hearing.

The claim for interest is based on two separate and distinct provisions of Alabama law. Under § 8–8–8 of the Code of Alabama (1975)[11], McKinney is entitled to interest from Collins from January 20, 1980, the date payment was due under the contract. Under § 39–1–1(b),[12] McKinney is entitled to interest from USF&G from the date of notice of the claim to the surety, which was given April 15, 1980. The legal rate of interest provided by § 8–8–1 of the Alabama Code is 6% per year when not otherwise provided by written contract. The amount owing on the contract in January and in April was $72,418.65. Collins, however, made a payment to McKinney of $34,973.05 on July 14, 1980, thus reducing the amount due to $37,445.60.

The court thus concludes that McKinney should recover interest apportioned as follows: from January 20, 1980 to April 14, 1980, Collins is solely liable for interest on $72,418.65 at the rate of 6% per annum; from April 15, 1980 to July 14, 1980, USF&G and Collins are jointly and severally liable for interest on $72,418.65 at 6%; from July 14, 1980 until the date of judgment, Collins and USF&G are jointly and

8. The amount of earth and rock excavation included in the proposal and base price was calculated from the indications on the structural drawings and was reflected in McKinney's scope sheet.

9. These computations, as done by McKinney and submitted to Collins, are set out in Appendix A to this opinion.

10. See footnote 3.

11. Section 8–8–8 of the Code of Alabama (1975) reads:
§ 8–8–8. Interest accrues on breach of contract.
All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act of duty bear interest from

the day such money, or thing, estimating at its money value, should have been paid, or such act, estimating the compensation therefore in money, performed.

12. Section 39–1–1(b), Code of Alabama (1975) states in part:
. . . In the event the surety or contractor fails to pay such claim in full within 45 days from the mailing of such notice, then such person or persons shall be entitled to recover of the contractor and surety, in addition to the amount of said claim, a reasonable attorney's fee, together with interest on such claim from the date of such notice.

severally liable for interest at 6% on $37,-445.60.

A separate order in conformity herewith is being entered contemporaneously.

## APPENDIX A

### McKINNEY DRILLING COMPANY

P.O. BOX 8   NACOGDOCHES, TEXAS 75961
(713) 564–8373   TWX 910–880–4229

300 DOVE ST.
BIRMINGHAM, AL. 35217
TELEPHONE (205) 841–0461

Birmingham, Alabama
April 10, 1980

DRYCREEK WASTEWATER TREATMENT PLANT
DECATUR, ALABAMA
329–025

CHANGES IN WORK

EARTH EXCAVATION
| | | | | |
|---|---|---|---|---|
| BID | 199.68 LF | | | |
| INSTALLED | 110.76 LF | | | |
| | − 88.92 LF | at $155.00/LF | = | − $13,782.60 |

ROCK EXCAVATION
| | | | | |
|---|---|---|---|---|
| BID | 8.00 LF | | | |
| INSTALLED | 93.71 LF | | | |
| | 85.71 LF | at $575.00/LF | = | + 49,283.25 |

EXPLORATORY TEST HOLES
| | | | | |
|---|---|---|---|---|
| BID | 40.00 LF | | | |
| INSTALLED | 117.00 LF | | | |
| | 77.00 LF | at $ 12.00/LF | = | + 924.00 |
| | | TOTAL EXTRAS | | + $36,424.65 |

(figures as per Law Engineering report dated December 13, 1979)