Plaintiff, ERA Commander Realty (hereinafter "Commander"), appeals from a summary judgment in favor of all defendants, and from the denial of its own motion for a partial summary judgment. We affirm.
 FACTS
Commander is a real estate company doing business in Gulf Shores, Alabama. Defendant Dwight Harrigan owned a large piece of real estate in Gulf Shores. Commander and Harrigan entered into a listing agreement giving Commander the right to list the property for sale. During the contract period, Harrigan personally sold the property to another defendant, Frank Caron, through Caron's real estate agents, Glen Bacher of Bacher Realty Corporation (hereinafter "Bacher") and Howard Yeager of Yeager Realty Corporation (hereinafter "Yeager").
The basis of Commander's appeal is that the listing agreement granted Commander the exclusive right to sell the property and that Harrigan breached that contract when he sold the property himself. Commander sued Harrigan for breach of contract, and sued Caron, Bacher, Bacher Realty, Yeager, and Yeager Realty for intentional interference in contractual or business relations. Commander also claims fraud and conspiracy to commit fraud, against all the defendants.
After filing an answer denying all claims, each defendant filed a separate motion for summary judgment. Oral arguments on the motions were heard together, but due to time constraints, Commander's oral argument was not heard. The court instructed Commander to file a brief, but set no time limit. Summary judgment was granted by the Court before Commander's brief was filed.
Commander subsequently moved to set aside the summary judgment in its favor of the defendants, and moved for a partial summary judgment in its favor on the issue of whether the contract granted Commander an exclusive right to sell the property. The court acknowledged its error in granting summary judgment prematurely, and it heard oral arguments on the merits. By order of July 10, 1986, the court refused to set aside the summary judgment, thus denying Commander's motion for a partial summary judgment.
Commander now appeals, claiming that the lower court erred in granting the summary judgment.
After listing the property "For Sale — By Owner," Harrigan was contacted by Commander's agent, John Crawford about entering into a listing agreement. Harrigan expressed his concern over listing the property with an agent. Since he had some interested parties and had dealt with a person named Carroway, to whom he had already given an oral option to purchase, he believed that he could sell the property himself. Commander wanted the listing and because of the concerns expressed by Harrigan, Commander amended its standard listing agreement and presented the modified agreement to Harrigan on August 12, 1983. Harrigan was reluctant, but finally signed the modified agreement on November 4, 1983.
The pertinent language of the unmodified listing agreement is as follows:
 In consideration of your agreement to list my . . . real property in your office in your customary manner and to use your efforts to procure a purchaser, I . . . hereby grant to you the exclusive, irrevocable right and privilege to sell my . . . real property. . . .
 1. I . . . agree to pay you a cash commission of 8 percent of the gross amount of any sale, agreement to sell, or exchange, which may be negotiated during the existence of this contract. The term 'sale' shall be deemed to include any exchange or trade to which I . . . consent. In the event of an exchange or trade, you are permitted to represent and receive compensation from both parties.
 2. If during the existence of this contract the property is sold by you, or me/us, or anyone else, or if you produce a purchaser ready, willing and able to purchase the property; or if within 60 days after the expiration of this contract, a sale is made to any person who was shown the property or to whom it was *Page 1331 
presented for sale, I . . . agree to pay you a commission as stipulated in next above paragraph unless such sale is made through a licensed real estate broker of this State who receives a sales commission of not less than the amount provided in this contract; provided that you make known to me/us in writing the names of anyone to whom you have shown or presented the property.
 3. This contract shall expire five months after date hereof (4 April 1984).
Only paragraph 2 of the standard agreement was modified or amended. The addendum was attached to the form agreement and states as follows:
 This Addendum shall modify and supersede the provisions of Paragraph 2 of the Sales Authority, dated 4 November 1983, granted to ERA Commander Realty, Inc., by Dwight Harrigan as follows:
 2. The payment of commission shall be paid to ERA Commander Realty only in the event that Commander produces a purchaser ready, willing and able to purchase the property; or if within sixty (60) days after expiration of this contract a sale is made to any parties who were shown the property, or to whom it was presented for sale, either directly or indirectly through personal sales efforts, referral, advertising or other means, by Commander, I . . . agree to pay you a commission as stipulated in Paragraph 1; provided that Commander makes known to me . . . in writing the names of any parties to whom Commander has shown or presented the property.
After obtaining the listing, Commander began to try to sell the property. On November 25, 1983, Commander obtained permission to remove the "For Sale — By Owner" signs and replaced them with Commander signs. It also placed the property on the Multiple Listing Service and began a letter-writing campaign to prospective buyers. On the same day, Harrigan's secretary spoke to John Crawford, the Commander agent, and referred Sherrill Real Estate to Commander. According to Crawford, Harrigan's secretary also told Crawford that Harrigan "had instructed her to refer Sherrill's and all other inquiries to [Commander]."
On December 3, 1983, Commander had its first response to the signs that had been placed on the property when Blalock Realty, which was working with Johnson-Rast Hays in Birmingham, contacted Commander. Several other realtors contacted Commander over the next several months, including Galen Hammond, an agent of Bacher Realty. The conversation was limited to Crawford's informing Hammond that Commander had a listing on the property and that the asking price was $2,600,000.00. Later, Hammond saw the president of Commander in a store and congratulated him on the listing.
Commander worked with several prospective buyers through Blalock Realty and Johnson-Rast Hays in Birmingham, but no offers were received until approximately February 10, 1984. On that day Commander received an offer from the principals of Investment Properties, Inc., a corporation that had not yet been formed at the time of the offer, through its real estate agent, Tom Archer. Harrigan rejected the offer by Investment Properties, Inc., because he thought it was speculative.
On February 27, 1984, Harrigan's attorney contacted Crawford and informed him that an offer had been made directly to Harrigan. As a result, Crawford contacted Archer and informed him of the other offer. On the following day, Harrigan informed Crawford that he was planning to meet with Caron on February 29 and that Caron had made a cash offer.
Prior to and following this conversation, Harrigan was working toward an agreement with Caron, who was represented by his real estate agents, Bacher and Yeager. Bacher had initially learned about the property sometime in 1982 or 1983, when Harrigan came to his office and asked him to place a sign for him. Bacher then informed Yeager about the land. Bacher and Yeager regularly took Caron to Gulf Shores to look for investment properties. In May or June of 1983, before the property was listed with Commander, Bacher and Yeager informed Caron about Harrigan's property. At that time, Caron had no use for the property.
However, sometime in February 1984, Caron became interested in the property again. With his agents, Bacher and Yeager, Caron contacted Harrigan directly about the property. Caron made a cash offer of $2,500,000.00. Harrigan counter-offered approximately $2,600,000.00, which Caron accepted. Yeager took the real estate purchase contract, on a Bacher form to Harrigan's attorney on February 27, 1984. The contract stated that the purchase price was $2,610,000.00, that there *Page 1332 
would be $10,000.00 in earnest money, and that Bacher and Yeager were to receive a commission constituting 10 percent of the purchase price. Caron was prepared to close within a few days, so Harrigan began the necessary proceedings to sell the property.
Knowing of the pending offer by Caron, Commander was pushing Investment Properties, Inc., to make a revised offer. On February 28, 1984, Commander received word from Archer that he was going to make another offer. Commander received from Archer a $3,000,000.00 offer on February 29, and immediately tried to contact Harrigan. At that time, Harrigan was in Mobile preparing to close the deal with Caron. Commander told Harrigan's secretary the specifics of the offer and later contacted Harrigan. The offer was contingent on a 60-day feasibility study, another 60 days for obtaining a national hotel franchise, and an additional 90 days to obtain a development loan, a total of seven months. Finally, Investment Properties, Inc., was willing to give only $1,000.00 as earnest money. The offeror was not to be obligated unless all these contingencies were met. Due to these contingencies, the low earnest money, and the fact that the corporation had not been formed yet, Harrigan refused the offer.
At no time prior to this lawsuit did Commander claim that it might be entitled to a commission on Harrigan's sale to Caron. To the contrary, Commander continued to work quickly to get a revised offer from Investment Properties, Inc., and from another party at Johnson-Rast Hays in Birmingham, who had also expressed some interest in the property.
Harrigan met with Caron, Bacher, and Yeager on the morning of February 29. At that time they decided that the purchase price would be listed as approximately $2,350,000.00, the net amount owed to Harrigan on the sale, less his prorated share of taxes and insurance, and that the remaining $260,000.00 would go directly to Bacher and Yeager as a commission.
During the closing, Bacher, Yeager, Caron, Harrigan, and Harrigan's attorney discussed the Commander listing agreement. Bacher and Yeager had seen the Commander signs on the property, and Bacher's agent, Galen Hammond, had had contact with two employees of Commander, each of whom told him that Commander had a listing on the property. However, Bacher and Yeager had learned about the property through Harrigan in 1982 or 1983, before the listing with Commander. In response to the question of whether Harrigan could sell the property himself, even though he had a listing agreement with Commander, Harrigan and his attorney assured Bacher, Yeager, and Caron that Harrigan had the authority to sell the property himself, as long as Caron had not seen or talked to Commander, or been shown the property by Commander.
To protect himself from liability and to insure that Caron had not been shown the property by Commander or its agents, Harrigan asked Caron to sign a provision indemnifying him from liability under his contract with Commander. Caron, Bacher, and Yeager reviewed the indemnity provision and concluded that because Caron had never met, nor even seen anyone from Commander, it was safe for him to assume that he would not be liable to Commander for a commission. Caron did not contact an attorney regarding this question, and he signed the indemnity provision.
The following issues are raised on appeal:
1. Whether there is any evidence creating a genuine issue of material fact on the meaning of the listing agreement and whether the trial court erred in granting Harrigan's motion for a summary judgment, and denying Commander's motion for a partial summary judgment on that issue.
2. Whether there is any evidence creating a genuine issue of material fact on Commander's claim for fraud, and whether the trial court erred in granting Harrigan's motion for summary judgment on that issue.
3. Whether the trial court erred in granting Bacher's, Bacher Realty's, Yeager's, Yeager Realty's, and Caron's motions for summary judgment.
4. Whether there is any evidence creating a genuine issue of material fact as to who produced Caron as a buyer of the real estate.
On the questions of the meaning of the listing agreement and whether Commander had an exclusive right to sell the property, we find no genuine issue of material fact. It is clear from the face of the contract and the undisputed facts surrounding *Page 1333 
the agreement that it was amended to allow Harrigan to sell the property himself, without entitling Commander to a commission. If there was no exclusive right for Commander to sell the property and receive a commission, then Harrigan could not have breached the contract by selling it through someone else.
We are of the opinion that there was no evidence to support Commander's claim for fraud, and we affirm the summary judgment on that claim.
Furthermore, because we conclude that Commander did not have an exclusive right to sell or receive a commission upon the sale of the land by Harrigan, the claims for intentional interference in contractual relations, fraud, and conspiracy to commit fraud against Bacher, Bacher Realty, Yeager, Yeager Realty, and Caron necessarily fail. We affirm the summary judgment in favor of the remaining defendants.
Whether there is any ambiguity in the contract is a question of law for the judge. If the contract is unambiguous, summary judgment is proper. Jones v. CentralBank of the South, 466 So.2d 932 (Ala. 1985); FoodService Distributors, Inc. v. Barber, 429 So.2d 1025
(Ala. 1983).
There is no dispute over the facts in this case, only the proper interpretation of the facts and of the contract. Commander wanted to list Harrigan's property with its company. Harrigan expressed some concern about limiting himself to a listing agreement because he thought he could sell the property himself. Since Harrigan was unwilling to sign the standard listing agreement, which would have given Commander an exclusive right to sell and a commission even if Commander did not actually sell the property, Commander wrote an amended listing agreement and presented it to Harrigan. Harrigan remained reluctant to sign, thinking that he still might be better off on his own. Three months after the contract was presented to him, Harrigan agreed to the modified listing agreement.
 EXCLUSIVE RIGHT TO SELL
Commander makes two related arguments: First, that the agreement was intended to allow Harrigan to sell to the one prospective buyer he had prior to signing the listing agreement, but to no one else; and second, that the preamble[1] to the entire agreement, which states that Commander had the "exclusive irrevocable right and privilege to sell," was entirely consistent with the addendum, which allowed Commander to obtain a commission only if it produced a buyer ready, willing, and able to purchase. Nonetheless, Commander argues that if its arguments are at least reasonable, it is entitled to have a jury decide the case.
As to the first point, there is no dispute that Harrigan's concern in signing an unmodified listing agreement with Commander was that he would be required to pay Commander a commission even if he sold the property himself. As a direct result of that concern, Commander modified the contract, using very broad terms. In determining the meaning of the contract, it is significant to compare Paragraph 2 of the unmodified agreement with the addendum that superseded it.
The original provision in Paragraph 2 permitted Commander to obtain a commission upon the sale of the property "[i]f during the existence of this contract the property [was] sold by you [Commander] or me [Harrigan] . . ., or anyone else." Under that contract, to which Harrigan did not agree, Commander would have had the exclusive right to sell the property, but if anyone else did sell the property, then Commander would still have been entitled to a commission.
Clearly, the amended provision does exactly the opposite. Rather than allowing Commander a commission no matter who sold the property, the amendment states that Commander could receive a commission "only" if it produced a buyer. The provisions regarding a sale by Harrigan or "anyone else" were deleted from the addendum. The only reasonable inference that can be drawn from that change is that if Harrigan or anyone else did sell the property, Commander would not receive a commission.
Since we ultimately conclude that there is no evidence that Commander procured *Page 1334 
Caron, the ultimate purchaser, and because Commander has abandoned its theory that Investment Properties, Inc., was a buyer "ready, willing, and able," Commander should not be entitled to a commission.
Furthermore, if the agreement was meant to be as limited as Commander suggests, Commander could have drafted the modified provision much more narrowly. In other words, the addendum could have stated that Commander would be entitled to a commission unless Harrigan sold the property to X, Y, or Z (presumably those potential purchasers Harrigan was already working with). But in drafting the addendum, Commander used very broad language with no limitations.
Commander also argues that it would not have entered into the listing agreement if it had known it was not exclusive, except with regard to Carroway, the one particular buyer Harrigan had dealt with prior to the agreement with Commander. However, Commander also claims that at the time Harrigan finally agreed to sign the listing agreement, he no longer had Carroway as a prospective buyer, and, thus, that the addendum served no further purpose. Yet, Commander still left the addendum in the agreement. If there was no longer any need for the addendum, why did Commander leave it in the agreement? The logical conclusion is that the addendum remained in the agreement because it was not, as Commander argues, mooted by the fact that one of Harrigan's prospective purchasers no longer appeared interested in the property; such a conclusion would substantiate the conclusion that the agreement was not intended to give Commander an exclusive right to sell the real estate.
Commander's second major argument is that the contract, as amended, is unambiguous and means that Commander has an exclusive right to sell Harrigan's property, even though it is entitled to a commission only if it produces a buyer ready, willing, and able. In other words, Commander claims that it need not be entitled to a commission to win this appeal because Harrigan breached the "exclusive right" provision and Commander is entitled to damages for that breach. However, Commander argues, if this Court finds that the contract is ambiguous, then the lower court's judgment should be reversed because Commander is entitled to a jury trial to resolve the ambiguity. Jones v. Chaney JamesConstruction Co., 399 F.2d 84 (5th Cir. 1968).
Determining whether a contract is ambiguous is a question of law for the trial judge to decide, P S Business v.South Central Bell Telephone Co., 466 So.2d 928, 931
(Ala. 1985), and if the parties' intent can be discerned from reading the contract, then that is also a question of law for the trial judge. Southeast Nursing Home, Inc. v. St. PaulFire Marine Ins. Co., 750 F.2d 1531 (11th Cir. 1985). The judge found no ambiguity in the contract and we conclude that in light of the undisputed facts, the only reasonable interpretation of the contract is that the addendum to the contract amended the exclusive right provision in the preamble.
Commander asserts a right to money damages for breach of the "exclusive rights" clause in the preamble, claiming that the contract gave it the exclusive right to sell for five months (until April 4, 1984), even though Commander could receive a commission only if it produced a buyer. Thus, Commander claims, it had until April 4 to find a buyer and, by selling the property himself on February 29, 1984, Harrigan prevented Commander from receiving a commission. We disagree.
This Court will not insert ambiguities into a contract by "strained and twisted meaning where no such ambiguities exist." South Central Bell, supra, citing Michigan MutualLiability Co. v. Carroll, 271 Ala. 404, 123 So.2d 920
(1960). The interpretation Commander suggests would require this Court to place a strained and twisted construction on the agreement.
First, the date only indicates the length of the contract; it does not determine the substantive question of whether there was an exclusive right to sell. Since we conclude that there was no exclusive right to sell, there can be no breach of the contract based on a violation of such an exclusive right.
Second, from the face of the agreement, as modified, it appears that Commander was entitled to a commission only if it produced the buyer. If, pursuant to the language of the preamble, the agreement was intended to give Commander an exclusive right to sell, there would be no need to specify that Commander would receive a commission only if it produced the buyer. That would be stating the obvious. Certainly no one *Page 1335 
would conclude that Commander would be entitled to a commission if it did not sell the property. If the language in the addendum is to mean anything, it must mean that Harrigan could sell the property himself, without giving Commander a commission.
Furthermore, Commander's interpretation of the agreement would yield ridiculous results. If it were true that the two provisions granted an exclusive right to sell, but a commission only if a buyer was produced, then even if Harrigan violated the exclusive right provision by selling the property himself, Commander would still not be entitled to a remedy (i.e., a commission) under the terms of the contract. There would be no reason to drastically limit Commander's right to a commission and also prohibit Harrigan from selling the property. Thus, even under Commander's interpretation of the contract, it could not recover.
We conclude that the face of the agreement, as well as the undisputed facts and intent of the parties, is sufficient for this Court to conclude that the contract did not grant an exclusive right to sell. Nonetheless, the rules of construction would still require this Court to find that the addendum supersedes the general language of the preamble. When there is a conflict in a contract, the specific substantive provisions control over general provisions.McKinney Drilling Co. v. Collins Co., 517 F. Supp. 320,324 (N.D.Ala. 1981). More specifically, this Court has previously rejected the argument that the preamble controls operative provisions of a contract. "[W]here the recitals are broader than the contract stipulations, the former will not extend the latter." Ingalls Iron Works Co. v.Ingalls, 256 Ala. 124, 128, 53 So.2d 847, 850 (1951). Thus, where there is an inconsistency in the contract, the specific, unambiguous provisions of the addendum prevail. Pursuant to the addendum, Commander was not entitled to an exclusive right to sell, nor is Commander entitled to a commission.
A third rule of construction applicable when contract terms are inconsistent with typewritten terms is that typewritten provisions prevail over printed matter. McKinney, supra;Industrial Machinery, Inc. v. Creative Displays, Inc.,344 So.2d 743 (Ala. 1977). This is a long-held presumption in the law, because typewritten provisions are thought to have commanded stricter attention than a standard form contract provision. McKinney, supra; Industrial Machinery,supra. Once again, the rules of construction lead us to conclude that if there is any ambiguity in the provisions, the rules of construction provide the answer. Since the typewritten addendum was unambiguous, it prevails.
A final rule of construction aiding us in interpreting this contract is the rule that an ambiguous contract is generally construed against the drafter. Colonial Baking Co. v.Pine Dale, Inc., 436 So.2d 856, 858 (Ala. 1983),citing Morrow v. Wood, 411 So.2d 120 (Ala. 1982);Travelers Insurance Co. v. Kernachan, 283 Ala. 96,99, 214 So.2d 447 (1968). Commander drafted the provision; thus any ambiguity should be construed against it. If the addendum was intended to mean what Commander asserts, then it could have been drafted much more narrowly. Because the addendum was stated broadly and with no limitations, we find that it permitted Harrigan to sell the property on his own, without entitling Commander to a commission.
But Commander further argues that if the contract is given the meaning asserted by the defendants, it gives Commander no better rights than any other real estate agent, and makes the contract useless. We disagree. Commander was permitted to place signs on the property and to place the property on the Multiple Listing Service under the name of the company, and was also authorized to advertise and represent that it had a listing on the property. All of these put Commander in a better position to sell the property than other real estate agents had.
Nonetheless, giving Commander the right to sell does not necessarily mean that no one else can be granted that same authority. The provisions in the contract permitted exactly that. Commander was given the authority to try to sell the property, but Harrigan was not precluded from giving another realtor permission to do the same. Until this lawsuit, Commander acted consistent with this interpretation of the contract. Specifically, Harrigan and his attorney informed Commander of the pending offer by Caron. At no time while Harrigan *Page 1336 
was working on the sale to Caron did Commander give any indication that Harrigan was acting inconsistent with the agreement, nor did Commander ever assert any right to a commission on the sale. To the contrary, Commander worked diligently to try to get either Investment Properties, Inc., or the Johnson-Rast Hays party to make an offer.
 FRAUD
Commander also claims that Harrigan defrauded the company. Commander claims it never would have entered into the listing agreement if it had known the company did not have an exclusive right to sell, except with regard to the one specific buyer Harrigan had worked with prior to the contract. Furthermore, Commander asserts that Harrigan caused the company to rely on his actions to its detriment. Crawford admits in his deposition that the Commander claims are based only on the facts that Harrigan signed the listing agreement and that Harrigan, through his secretary, represented to Crawford that all inquiries on the property were to be directed to Commander.
We find no merit to Commander's claims. Commander cannot rely on the fact that Harrigan actually signed the listing agreement to claim fraud. The meaning of the listing agreement is the substantive issue in the case. In addition, the representations, if any, made by Harrigan's secretary did not occur until after the parties had entered into the contract. Commander could not have relied on these purported representations in entering into the agreement, nor do the statements go to the issue of fraud.
 INTENTIONAL INTERFERENCE WITH BUSINESS OR CONTRACTUAL RELATIONS
It follows from the finding that Commander had no exclusive right to sell the property, that the claim against Bacher, Bacher Realty, Yeager, Yeager Realty, and Caron for intentional interference with contractual relations must also fail. Furthermore, we do not find any evidence supporting the plaintiff's claim for fraud against these defendants and that, too, must fail.
 PROCUREMENT OF THE BUYER
The final issue on appeal is whether there is any evidence creating a genuine issue of material fact over who produced Caron as the buyer of the real estate. On appeal, Commander asserts for the first time that it produced Caron as the purchaser of the property and is entitled to a commission under the terms of the contract. We find no sufficient evidence to create a genuine issue of material fact on that question.
Commander does not claim that it ever had any direct contact with Caron. Commander asserts only that it indirectly produced Caron as a purchaser through its signs and advertising. However, there is absolutely no evidence that Caron learned of the property through any advertising or signs. In fact, it is undisputed that Bacher and Yeager had learned of the property in 1982 or 1983, prior to the time Commander obtained a listing on the property. Bacher learned of the property when Harrigan personally came to his office and asked him to place a sign for him. Bacher then informed Yeager about the property, and together they informed Caron about the property, though Caron was not interested at the time. All this occurred long before Commander obtained a listing on the property.
But Commander also claims that it indirectly produced Caron as the purchaser when Bacher Realty, through its agent Galen Hammond, contacted Commander regarding the price and the listing agreement. Commander asserts that Bacher learned of the property through Commander and that in that way Commander indirectly produced Caron as the purchaser.
First, it is not unusual for one real estate agent to contact another regarding information on the property listed by the agent, even if there is no particular buyer in mind. Commander even states in its brief that it had received calls "from most of the real estate firms in the area for information on the property." It was not unusual for Bacher's firm to do the same. The fact that Bacher's agent had minimal contact with Commander does not mean that Bacher learned of the property through Commander. In fact, it remains undisputed that both Bacher and Yeager had learned about the property and had told Caron *Page 1337 
about it long before Commander obtained a listing. Thus, it is not reasonable to conclude that Commander's advertising informed Bacher and Yeager about the property.
On these undisputed facts, there is no basis for concluding that Commander actually produced Caron as the purchaser, either directly or indirectly.
For the foregoing reasons, the judgment of the circuit court is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and STEAGALL, JJ., concur.
[1] There has been some dispute between the parties over the meaning of the term "preamble." Whatever the clause prior to the numbered provisions of the contract is called, for the reasons in our opinion, we conclude that the provision has no meaning independent of the substantive numbered provisions of the contract. We choose to call the clause a "preamble."